1   COOLEY LLP
    TIMOTHY S. TETER (171451)
2   (teterts@cooley.com)
    BENJAMIN G. DAMSTEDT (230311)
3   (bdamstedt@cooley.com)
    LOWELL D. MEAD (223989)
4   (lmead@cooley.com)
    PRIYA VISWANATH (238089)
5   (pviswanath@cooley.com)
    DENA CHEN (286452)
6   (dchen@cooley.com)
    3175 Hanover Street
7   Palo Alto, CA 94304
    Tel:  650-843-5000
8   Fax:  650-849-7400

9   Attorneys for Defendant Apple Inc.

10  *Counsel for Defendants in other cases provided in signature
    block*

11

12          UNITED STATES DISTRICT COURT

13          SOUTHERN DISTRICT OF CALIFORNIA

14                SAN DIEGO DIVISION

15

| | |
|---|---|
| 16  ODYSSEY WIRELESS, INC., | Case No.  3:15-CV-01735-H-RBB |
| 17                Plaintiff, | **DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF** |
| 18          v. | Date:    March 29, 2016 |
| 19  APPLE INC., | Time:    9:00 a.m.<br>Ctrm:    15A |
| 20                Defendant. | Judge:   Hon. Marilyn Huff |
| 21 | |
| 22  ODYSSEY WIRELESS, INC., | Case No.  3:15-cv-01738-H-RBB |
| 23                Plaintiff, | |
|          v. | |
| 24  SAMSUNG ELECTRONICS CO., LTD, et al., | |
| 25 | |
| 26                Defendants. | |
| 27 | |

28

| ODYSSEY WIRELESS, INC., | Case No.  3:15-cv-01741-H-RBB |
|---|---|
| Plaintiff, | |
| v. | |
| MOTOROLA MOBILITY LLC, | |
| Defendant. | |
| ODYSSEY WIRELESS, INC., | Case No.  3:15-cv-01743-H-RBB |
| Plaintiff, | |
| v. | |
| LG ELECTRONICS, INC., et al., | |
| Defendants. | |

DEFENDANTS' OPENING
CLAIM CONSTRUCTION BR.

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...........................................................................................1

II. FACTUAL BACKGROUND ..........................................................................1

III. DISPUTED CLAIM TERMS .........................................................................5

A. "U(nT)" (Term 14) – Claims of All Patents-in-Suit ...........................5

B. Claim Terms in the '940 and '169 Patents........................................10

    1. "mapping by the processor the information symbol sequence $\{I_k\}$ into a waveform sequence $\{U_k(nT)\}$" and related terms (Terms 19-24, with Terms 25-26)    10

        a. Terms 19-24    10

        b. Terms 25-26    12

    2. "waveform alphabet" (Term 27)    12

    3. "radiating by the transmit antenna the baseband waveform sequence $\{U_k(nT)\}$" and related terms (Terms 28-30)    13

C. Claim Terms in the '393, '837, '606, and '230 Patents......................16

    1. "a processor that is configured [1] to provide a frequency content for a waveform by Fourier transforming a signal, [2] to form a desired spectrum shape for the waveform, that differs from the frequency content, responsive to the frequency and [3] to generate the waveform by inverse Fourier transforming the desired spectrum shape" and related terms (Terms 8-9, with Terms 1-3, 15-18)    16

    2. Spectrum-shaping terms in the '230 and '837 patents    20

        a. '230 patent: "forming at baseband a desired spectrum shape" and related terms (Terms 4, 10)    20

        b. '837 patent: "forming a desired spectrum shape for a waveform" and related terms (Terms 6, 12)    22

1
2

**Table of Contents**
**(continued)**

Page

3
4
5
6
7
8
9
10

        3.    "selecting a frequency interval over which a waveform
U(nT) is to exist; wherein n denotes a discrete time index
and wherein n=1, 2, ... , N; allowing at least one frequency
that is included in the selected frequency interval to provide
a frequency content to the waveform U(nT); excluding at
least one frequency that is included in the selected frequency
interval from providing a frequency content to the waveform
U(nT); forming the waveform U(nT) comprising a plurality
of elements U(T), U(2T), ... , U(NT), corresponding to
respective integer values 1, 2, ... , N of the discrete time
index n" and related terms (Terms 5, 7)        23

11

IV.    CONCLUSION ............................................................................25

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Abbott Labs v. Sandoz,*
    566 F.3d 1282 (Fed. Cir. 2009) ...................................................... 8, 23

*Aristocrat Techs. v. Int'l Game Tech.,*
    521 F.3d 1328 (Fed. Cir. 2008) .......................................................... 11

*August Tech. v. Camtek,*
    655 F.3d 1278 (Fed. Cir. 2011) .......................................................... 16

*Digital-Vending Servs. Int'l v. Univ. of Phoenix,*
    672 F.3d 1270 (Fed. Cir. 2012) .......................................................... 23

*Helmsderfer v. Bobrick Washroom Equip.,*
    527 F.3d 1379 (Fed. Cir. 2008) .......................................................... 16

*Honeywell Int'l v. Universal Avionics Sys.,*
    488 F.3d 982 (Fed. Cir. 2007) .............................................................. 5

*J.T. Eaton & Co. v. Atl. Paste & Glue,*
    106 F.3d 1563 (Fed. Cir. 1997) ............................................................ 6

*Liebel-Flarsheim v. Medrad,*
    481 F.3d 1371 (Fed. Cir. 2007) ............................................................ 8

*Media Rights Techs. v. Capital One,*
    800 F.3d 1366 (Fed. Cir. 2015) .......................................................... 11

*Netword v. Centraal,*
    242 F.3d 1347 (Fed. Cir. 2001) .......................................................... 21

*Network Commerce v. Microsoft,*
    422 F.3d 1353 (Fed. Cir. 2005) ............................................................ 5

*O2 Micro Int'l v. Beyond Innovation Tech.,*
    521 F.3d 1351 (Fed. Cir. 2008) ................................................... 5, 17, 24

*On Demand Mach. v. Ingram Indus.,*
    442 F.3d 1331 (Fed. Cir. 2006) ........................................................ 8, 9

1

2

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Phillips v. AWH*,
　415 F.3d 1303 (Fed. Cir. 2005) (en banc) .................................................8, 12, 13

*Respironics v. Invacare*,
　303 F. App'x 865 (Fed. Cir. 2008) ......................................................................23

*Retractable Techs. v. Becton, Dickinson & Co.*,
　653 F.3d 1296 (Fed. Cir. 2011) .......................................................................8, 17

*Williamson v. Citrix Online*,
　792 F.3d 1339 (Fed. Cir. 2015) (en banc) ...........................................................11

## Statutes

35 U.S.C. § 112..........................................................................................................8

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF EXHIBITS**

2

3

| Ex. | Abbrev. | Exhibit |
|-----|---------|---------|
| 1 | '393 Patent | U.S. Patent No. 7,881,393 (issued Feb. 1, 2011) |
| 2 | '837 Patent | U.S. Patent No. 8,199,837 (issued June 12, 2012) |
| 3 | '940 Patent | U.S. Patent No. 8,576,940 (issued Nov. 5, 2013) |
| 4 | '169 Patent | U.S. Patent No. 8,660,169 (issued Feb. 25, 2014) |
| 5 | '230 Patent | U.S. Patent No. 8,855,230 (issued Oct. 7, 2014) |
| 6 | '606 Patent | U.S. Patent No. 8,879,606 (issued Nov. 4, 2014) |
| 7 | '393 File History | File history for the '393 patent (excerpts) |
| 8 | '837 File History | File history for the '837 patent (excerpts) |
| 9 | '940 File History | File history for the '940 patent (excerpts) |
| 10 | '169 File History | File history for the '169 patent (excerpts) |
| 11 | '230 File History | File history for the '230 patent (excerpts) |
| 12 | '606 File History | File history for the '606 patent (excerpts) |
| 13 | '115 File History | File history for U.S. Application No. 11/720,115, which issued as U.S. Patent No. 8,050,337 |
| 14 | '354 File History | File history for U.S. Application No. 12/372,354, which issued as U.S. Patent No. 7,876,845 |
| 15 | EICES SBIR Response | Response of EICES Research, Inc. to: Air Force Topic AF131-049 of SBIR Program Solicitation FY 13.1 |
| 16 | EICES Proposal D052-019 | EICES Research, Inc., Robust Communications for Low Probability of Intercept (LPI), Low Probability of Detection (LPD) and Low Probability of Exploitation (LPE) of Communications Information, Proposal No. D052-019-0085 |
|  | Acampora Decl. | Declaration of Anthony Acampora, Ph.D., Regarding Claim Construction (filed concurrently), including Exhibits A through C |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I. INTRODUCTION

The six patents-in-suit address a narrow alleged invention. The inventor, Peter D. Karabinis, was concerned that a "sophisticated interceptor" could use the periodic characteristics of certain wireless signals to detect that the signals were man-made and thus might be of interest. ('393 patent, 19:55-20:15.) Operating under the name EICES Research, Karabinis attempted to develop a covert communications system for the military by using waveforms with specific, non-periodic characteristics he believed would make them harder to detect.

Although the military was not interested in the idea, EICES learned of the cellular industry's work on the 4th Generation ("4G") standard called "LTE" ("Long Term Evolution"). EICES played no role in developing LTE, and the purported invention has no relevance to commercial cellular products, which are based on periodic features and use encryption, not covertness, to protect signals. Nevertheless, EICES claimed to have accidentally invented a portion of LTE related to the "uplink" or "return link." After changing its name to Odyssey Wireless during this litigation, Plaintiff now generally accuses LTE uplink functionality in Defendants' cellular products.

Odyssey proposes a "plain and ordinary meaning" construction for every term in each of the 140 asserted claims. Contrary to Federal Circuit case law, Odyssey's proposal seeks to shift the parties' dispute over claim meaning to arguments at a trial before a jury and, ultimately, to untether the claim scope from the alleged invention described in the patents. In contrast, Defendants' proposed constructions are well-grounded in the intrinsic record and should be adopted.

## II. FACTUAL BACKGROUND

The alleged invention in the patents-in-suit "relates to low interference, high privacy, featureless covert communications systems."[1]   ('393 patent, 1:40-54;

---

[1] As the patents-in-suit share many disclosures, the citations to the '393 patent in

Acampora Decl., ¶¶ 74-76.)  The patents state that "conventional communications systems" send signals with periodic characteristics – called "cyclostationary" signatures – that a "sophisticated interceptor" could supposedly detect using a "cyclic periodogram." (*Id.*, 19:1-25, 19:55-20:15.)

To make signals harder to detect, the patents use a "signaling alphabet" with waveforms that do not have those periodic characteristics. (*Id.*, 2:16-43.) Specifically, the patents use a set of waveforms that are each "Pseudo-Random," "Non-Cyclostationary," and "Orthonormal."[2] (*E.g.*, *id.*, Fig. 1.)  A detailed tutorial regarding those concepts is provided in the Acampora Declaration.  (Acampora Decl., ¶¶ 22-73)  As an example, the figure below and left shows a pseudo-random, non-cyclostationary waveform that may be used in creating the patents' signaling alphabet.  In contrast, the figure below and right shows a sinusoidal waveform having periodic properties like those disparaged in the patents as easy to detect.[3]

| Pseudo-Random, Non-Cyclostationary Waveform ('393 Patent, Fig. 3 (excerpt)) | Sinusoidal Waveform (Acampora Decl., ¶ 32) |
|---|---|
|  |  |

Some of the claims also add well-known features onto the patents' signaling alphabet.  For example, some claims create the alphabet in a way that attempts to

---

this section are representative across the patents. (Acampora Decl., ¶¶ 78-79.)

[2] For brevity, this brief uses the term "orthonormal" to mean "orthogonal and/or orthonormal."  (*See* Acampora Decl., ¶¶ 40-41 (describing meaning of "orthogonal" and "orthonormal").)

[3] As discussed below, the patents use specific, coined terminology to refer to the signaling alphabet, defining the signaling alphabet as "{U(nT)}," an element of the signaling alphabet as "U(nT)," and specific elements of the signaling alphabet by number as "$U_1(nT)$," "$U_2(nT)$," through "$U_M(nT)$."

1   address potential interference from "incumbent users," while still maintaining the
2   covertness of the signals.  ('393 patent, 29:14-27, 29:33-52.)  Those claims apply
3   an old technique called "water filling," which allocates more transmission power to
4   frequencies detected to have less interference and less transmission power to
5   frequencies detected to have more interference.[4]  (Acampora Decl., ¶¶ 52-67.)

6       As shown in Figure 17, the "Power Spectrum Estimator" (in brown)
7   calculates the level of interference from other transmitters, the "Water Filling
8   Spectrum Shaping" step (in blue) creates a "Desired Spectrum Shape" by allocating
9   more power to frequencies with low measured interference, and the remaining three
10  colored blocks (in yellow) convert the desired spectrum shape into waveforms with
11  the patents' specific pseudo-random, non-cyclostationary, and orthonormal
12  characteristics.  ('393 patent, Fig. 17, 30:5-23; Acampora Decl., ¶¶ 164-75.)

13  **'393 Patent, Fig. 17 (annotated) (Acampora Decl., ¶ 164)**



FIGURE 17

23      The prosecution histories also emphasize the patents' alleged invention of
24  waveforms with these specific characteristics.  In 2005, EICES filed its first
25  applications relating to the signaling alphabet.  While prosecuting a parent
26  application to which each patent-in-suit claims priority, EICES distinguished the

27  _____
28  [4] EICES named this method the "neXt Generation (XG) Chipless Spread-Spectrum
    Communications (CSSC) System" or "XG-CSSC."  ('393 patent, 29:14-22.)

DEFENDANTS' OPENING
                                                                  CLAIM CONSTRUCTION BR.

alleged invention as a whole from the prior art, emphasizing the pseudo-random characteristic of its signaling alphabet. (*E.g.*, '115 File History, ODY_DEFS_00000311 ("The concept of using a pseudo-randomly generated alphabet that comprises a plurality of waveform elements is simply foreign and goes against the grain of conventional communication systems."); Acampora Decl., ¶¶ 109-17.) EICES also distinguished its alleged invention from "conventional communication systems," such as GSM (a 2G cellular technology), CDMA (a 2G and 3G cellular technology), and OFDM (a 4G cellular technology). (*Id.* at ODY_DEFS_00000300 ("[A] GSM system or a CDMA system uses a communications alphabet whose elements are predetermined constellation points, NOT pseudo-random waveform elements"); *id.* at ODY_DEFS_00000312 (distinguishing performance of the alleged invention from OFDM).)

In 2008, EICES filed its first application relating to the use of water-filling in creating the signaling alphabet. While prosecuting another parent application, EICES again distinguished its alleged invention as a whole from conventional systems like OFDM. (Acampora Decl., ¶¶ 118-21.) EICES argued, for example, that using a mathematical operator called an "IFFT" to "modulat[e] data bits onto OFDM subcarriers" has "*nothing to do with* the formation of a communications alphabet." ('354 File History, ODY_DEFS_00000958 (emphasis added).)

Despite repeatedly distinguishing the alleged invention from commercial cellular technologies, EICES announced in 2010 that certain "claims may apply to the return link of [an LTE] communication system." ('393 File History, ODY0000195.) EICES did not tell the Patent Office what part of the LTE "return link" the claims allegedly related to, nothing in the record supports EICES' statement, and the Patent Office did not comment on EICES' assertions about LTE.

In 2014, Plaintiff sued Defendants based on sales of smartphones compatible with LTE networks and now asserts 140 claims from six patents, accusing systems that have no relationship to its alleged invention but instead have the same features

1   it expressly distinguished in the intrinsic record.  To try to read its claims on

2   Defendants' products, Odyssey proposes constructions completely divorced from

3   the alleged invention described in the patents.

4   **III.   DISPUTED CLAIM TERMS**

5     **A.   "U(nT)" (Term 14) – Claims of All Patents-in-Suit**

6

7

| Defendants' Construction | Plaintiff's Construction |
|---|---|
| "a waveform within a set of discrete-time, pseudo-random non-cyclostationary and orthogonal and/or orthonormal waveforms that define a waveform alphabet" | Odyssey maintains that no construction is necessary for this term. This claim term should be afforded its plain and ordinary meaning.<br><br>However, should the Court decide to construe this term, then Odyssey proposes the following construction:<br><br>"a discrete time-domain waveform, wherein n denotes a discrete time index of the discrete time-domain waveform" |

14       Odyssey proposes a "plain meaning" construction for "U(nT)," but the term

15   does not have a plain and ordinary meaning.  Instead, "U(nT)" is a coined term

16   defined in the patents.  (Acampora Decl., ¶¶ 81-82.)

17       Odyssey's "plain meaning" proposal contradicts Federal Circuit law.  "When

18   the parties raise an actual dispute regarding the proper scope of [the] claims, the

19   court, not the jury, must resolve the dispute."  *O2 Micro Int'l v. Beyond Innovation*

20   *Tech.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008).  Moreover, when a claim uses a

21   coined mathematical term like U(nT) that lacks a customary meaning, the

22   specification provides the meaning.  *Honeywell Int'l v. Universal Avionics Sys.*, 488

23   F.3d 982, 991 (Fed. Cir. 2007) ("Without a customary meaning of a term within the

24   art, the specification usually supplies the best context for deciphering claim

25   meaning.").[5]

26

27   _____

28   [5] *See also, e.g., Network Commerce v. Microsoft*, 422 F.3d 1353, 1359-1360 (Fed. Cir. 2005) (term with "no commonly understood meaning" construed in "light of

Here, "U(nT)" does not cover every possible type of waveform. Instead, the specification expressly defines U(nT) as a discrete-time waveform with particular characteristics, and consistently and repeatedly refers to those characteristics. (Acampora Decl., ¶¶ 85-107.) Figure 1 and the accompanying text define the set of U(nT) waveforms as an "M-ary Pseudo-Random Non-Cyclostationary Orthonormal Alphabet." ('393 patent, Fig. 1, 20:21-21:52.) They likewise expressly equate the set of U(nT) elements with the set of numbered pre-generated waveform elements: "{U(nT)} = {$U_1$(nT), $U_2$(nT), ... , $U_M$(nT)}." (*Id.*, 21:43-46, Fig. 1; Acampora Decl., ¶ 95 ("{}" is standard notation for a set of elements).) Figure 5 likewise describes the patents' signaling alphabet as an "M-ary Pseudorandom and Non-Cyclostationary, Orthonormal Signaling Alphabet." ('393 patent, Fig. 5.)

| '393 Patent, Fig. 1 (annotated) | '393 Patent, Fig. 5 (annotated) |
|---|---|



Similarly, the text accompanying Figure 17 states: "The set of orthonormal waveforms {$U_1$(nT), $U_2$(nT), ... , $U_M$(nT)} may be used to define an M-ary orthonormal Gaussian-distributed signaling alphabet." (*Id.*, 30:45-47, Fig. 17; *id.*, 2:27-28 ("for example, Gaussian-distributed pseudo-random noise"), 2:53-55 (discussing Gaussian and Rayleigh distributions).)

Thus, the patents make clear that the claimed "U(nT)" waveform must have

the specification"); *J.T. Eaton & Co. v. Atl. Paste & Glue*, 106 F.3d 1563, 1570 (Fed. Cir. 1997) (when a term is "unknown to those of ordinary skill in the art," it falls "to the applicants, as a duty, to provide a precise definition").

these particular characteristics, which are critical to the alleged invention.

The prosecution histories further support Defendants' construction. (Acampora Decl., ¶¶ 108-22.)  While prosecuting the '115 application, a parent to the patents-in-suit, EICES described the prior art systems as using "deterministically predetermined" and "invariant" point constellations.  ('115 File History, ODY_DEFS_00000299-300, 311.)  EICES explained that, in contrast, the purported invention as a whole used waveforms with specific characteristics, *i.e.*, pseudo-random, non-cyclostationary, and orthonormal waveforms.  (*E.g.*, *id.* at ODY_DEFS_00000311 ("The concept of using a pseudo-randomly generated alphabet that comprises a plurality of waveform elements is simply foreign and goes against the grain of conventional communication systems.").)

EICES also highlighted the specific characteristics of its signaling alphabet while prosecuting another parent application, the '354 application:

> *What are the characteristics of this alphabet?*  First, each member thereof is a waveform that is *pseudo-randomly* generated due to the pseudo-random assignment of the phase components associated therewith.  Moreover, at least two of these pseudo-random waveforms are *orthogonal* to one another due to the orthogonalizing....  The pseudo-random waveforms have *reduced cyclostationarity* because they do not include any repetitive/periodic feature.

('354 File History, ODY_DEFS_00000953 (emphasis added).)

In short, these specific characteristics included in the patents' definition of "U(nT)," and omitted by Odyssey, are necessary to accomplish the purpose of the alleged invention.  As discussed above, to create a system with "extreme privacy," Odyssey proposed using "waveforms that are *devoid of … any cyclostationary signature*."  ('393 patent, 29:14-27 (emphasis added); *id.*, 1:40-54 ("This invention relates to low interference, high privacy, featureless covert communication systems ...."); *id.*, 18:50-19:25 (describing detectability of periodic features of signals sent

**DEFENDANTS' OPENING
CLAIM CONSTRUCTION BR.**

by ordinary commercial systems); Acampora Decl., ¶¶ 74-76, 85-124.)  Removing the specific characteristics from the definition of "U(nT)" would defeat the very purpose of Odyssey's alleged invention and contradicts Federal Circuit law. *On Demand Mach. v. Ingram Indus.*, 442 F.3d 1331, 1340 (Fed. Cir. 2006) (adopting scope "described as the advantage and distinction of the invention").[6] Moreover, reading out the specific waveform characteristics that allegedly distinguished it over the prior art would render the claims invalid under 35 U.S.C. § 112.  *Abbott Labs v. Sandoz*, 566 F.3d 1282, 1288 (Fed. Cir. 2009) ("[T]he claims cannot enlarge what is patented beyond what the inventor has described as the invention.") (internal quotation omitted).[7]

Odyssey ignores the relevant intrinsic evidence and prosecution history, citing Figure 16 and the accompanying text instead.  (Dkt. 144, Ex. A at 37 (citing '393 patent, 28:6-21, Fig. 16); Acampora Decl., ¶¶ 106-07.)  Figure 16 does not use the term U(nT) and provides no support for Odyssey's efforts to read out the waveform characteristics from the definition of "U(nT)."  Figure 16 instead refers to a *dual-mode* "Selective Transmitting" device, which includes (1) a mode using covert Low Probability of Intercept/Low Probability of Detection/Low Probability of Exploitation (*i.e.*, LPI/LPD/LPE) communications and (2) a conventional mode. ('393 patent, Fig. 16, 1:40-54, 28:6-21.)  If the user desires covert communications,

---

[6] *Retractable Techs. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011) (court is "required to tether the claims to what the specifications indicate the inventor actually invented"); *Phillips v. AWH*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc) (claims construed based on "what the inventors actually invented").
[7] Section 112 requires that a patent describe and enable the "full scope" of the claimed invention.  *E.g.*, *Liebel-Flarsheim v. Medrad*, 481 F.3d 1371, 1379-80 (Fed. Cir. 2007).  Here, the patents describe only the use of waveforms with specific characteristics, and any construction that enlarges the scope of "U(nT)" beyond those characteristics would render the claims invalid.  *Id.* at 1380 (claims found invalid after patentee "pressed to have" broad claims: "The motto, 'beware of what one asks for,' might be applicable here.").

then non-cyclostationary waveforms are used; otherwise, conventional, cyclostationary waveforms are used.  Nothing in Figure 16 suggests that the alleged invention could cover a *single-mode* device using only cyclostationary waveforms. (*E.g.*, *id.*, 28:18-21 ("[A] given system ... can operate in one of *two modes*, depending on whether LPI/LPD/LPE communications are desired.") (emphasis added).)

| **'393 Patent, Fig. 16 (annotated)** |
| --- |
|  |

Finally, Odyssey proposes in the alternative that U(nT) be defined as "a discrete time-domain waveform, wherein n denotes a discrete time index of the discrete time-domain waveform."  (Dkt. 144, Ex. A at 37.)  The parties agree that U(nT) must be discrete time, but Odyssey's proposal would improperly read out the other characteristics, which Odyssey itself attributed to U(nT) and then repeatedly used to distinguish the claimed waveforms from the prior art.  *On Demand Mach.*, 442 F.3d at 1340.  In addition, Odyssey's proposal simply repeats language already in the claim:

> generating a *discrete time-domain* waveform U(nT);
> *wherein n denotes a discrete time index* of U(nT), wherein
> n=1, 2, ... , N ....

(*E.g.*, '393 patent, claim 1 (emphasis added); Acampora Decl., ¶ 84.)

Accordingly, the term "U(nT)" should be construed as "a waveform within a set of discrete-time, pseudorandom, non-cyclostationary, and orthogonal and/or orthonormal waveforms that define a waveform alphabet."  (Acampora Decl., ¶¶ 123-24.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**B.    Claim Terms in the '940 and '169 Patents**

     **1.    "mapping by the processor the information symbol sequence $\{I_k\}$ into a waveform sequence $\{U_k(nT)\}$" and related terms (Terms 19-24, with Terms 25-26)**

          **a.    Terms 19-24**

| Defendants' Construction (*e.g.*, Term 19) | Plaintiff's Construction (*e.g.*, Term 19) |
|---|---|
| "assigning by the processor each symbol in a symbol sequence $\{I_k\}$ to a corresponding one of M waveforms of the waveform alphabet $\{U_1(nT), \ldots, U_M(nT)\}$ in sequence" | Plain meaning |

The "mapping" limitations in Terms 19-24 use coined terms like "$\{I_k\}$" and "$\{U_k(nT)\}$" that do not have plain and ordinary meanings. (Acampora Decl., ¶¶ 127-28, 131.) Their meanings must be discerned from the intrinsic evidence.

Terms 19-24 recite how the patents' signaling alphabet is used, "mapping" each information symbol onto one of the M elements of the signaling alphabet to create a sequence of waveforms. (Acampora Decl., ¶¶ 126-36.) Figure 4 shows that the transmitter takes a sequence of information symbols as inputs ($\{I_k\}$) and then uses the patents' signaling alphabet (the allegedly inventive M-ary Pseudo-Random Non-Cyclostationary Orthonormal Alphabet) to output a sequence of waveforms ($\{U_k\}$) that corresponds to the information symbols. The patents' text corresponding to Figure 4 provides an example of the claimed mapping in which the second information symbol ($I_2$) is mapped onto the second waveform ($U_2(nT)$) from the signaling alphabet at time k: "if $I_k=I_2$, then during the $k^{th}$ signaling interval the waveform $U_2(nT)$ may be transmitted." ('940 patent, 5:58-59, 7:27-36.)

| '940 Patent, Fig. 4 (excerpt) |
|---|



**DEFENDANTS' OPENING CLAIM CONSTRUCTION BR.**

1      Odyssey cites no evidence that would allow it to evade the one-to-one

2    mapping between information symbols and elements of the signaling alphabet.

3    Rather, Odyssey relies on the same passages supporting Defendants' construction.

4    (Dkt. 144, Ex. A at 52 (citing '940 patent, 5:48-60, 7:27-36, Fig. 7).)  Odyssey also

5    cites an additional passage stating that the "ordering or indexing of the alphabet

6    elements" can change.  ('940 patent, 5:65-6:10.)  But that passage still requires an

7    "unambiguous mapping" between the M information symbols and the

8    M waveforms in the signaling alphabet.  (*Id.*; Acampora Decl., ¶¶ 133-34.)

9      In addition, Terms 22-24 are apparatus claims reciting "processor configured

10   to ..." language that should be construed as a means-plus-function limitation.  The

11   Federal Circuit recently reiterated that a claim term "can operate as a substitute for

12   'means' in the context of § 112, para. 6" where it provides only "a generic

13   description for software or hardware that performs a specified function."

14   *Williamson v. Citrix Online*, 792 F.3d 1339, 1349-50 (Fed. Cir. 2015) (en banc).

15   Under *Williamson*, if the claim term does not denote a "sufficiently definite"

16   structure for performing the function, it should be construed under § 112, ¶ 6.  *Id.* at

17   1348.  As the Federal Circuit has held in many cases, a "general purpose computer

18   or microprocessor" is not a sufficiently definite structure for performing a specific

19   function recited in the claims.  *E.g.*, *Aristocrat Techs. v. Int'l Game Tech.*, 521 F.3d

20   1328, 1333-38 (Fed. Cir. 2008) (finding claims indefinite where specification

21   disclosed only a general purpose processor); *Williamson*, 792 F.3d at 1352 (citing

22   *Aristocrat*, 521 F.3d at 1333).  Instead, the specification must disclose the algorithm

23   performed by the processor, and the claim scope is limited to that algorithm.

24   *Aristocrat*, 521 F.3d at 1333-38.  In short, a patentee cannot escape the provisions

25   of § 112, ¶ 6 by electing to use a generic reference to a "processor" rather than the

26   word "means" in the claim.

27      Here, the claimed "processor configured to ..." is merely a generic "black box

28   recitation," not sufficiently definite structure.  *Williamson*, 792 F.3d at 1350; *Media*

*Rights Techs. v. Capital One*, 800 F.3d 1366, 1373-75 (Fed. Cir. 2015) ("compliance mechanism" did not connote structure).  Accordingly, the term should be construed as a means-plus-function limitation, with the corresponding algorithm in the specification being the function recited in Defendants' construction.  (*See* '940 patent, 5:51-60, 11:3-11; Acampora Decl., ¶ 136.)

In sum, under either a *Phillips* analysis or pursuant to means-plus-function authority, the Court should adopt Defendants' constructions for Terms 19-24.

### b. Terms 25-26

In addition, resolving the dispute regarding the scope of U(nT) and the mapping terms also resolves the dispute over Term 25 relating to the "waveform sequence $\{U_k(nT)\}$," a similarly coined term.  In short, the claims and specification show that the signaling alphabet consists of pseudo-random, non-cyclostationary, and orthonormal waveforms.  The waveform sequence $\{U_k(nT)\}$ must also have the characteristics, because it is built from the waveforms in the alphabet.  (Acampora Decl., ¶ 138.)

The same analysis holds true for Term 26, "waveform sequence $\{U_j(iT)\}$," which refers to the waveform received by the receiver.  (Acampora Decl., ¶¶ 139-41.)  The waveform sequence $\{U_j(iT)\}$ has the same discrete-time, pseudo-random, non-cyclostationary, and orthonormal properties as $\{U_k(nT)\}$, and thus Defendants' construction should be adopted.  (*Id.*)

### 2. "waveform alphabet" (Term 27)

| Defendants' Construction | Plaintiff's Construction |
| --- | --- |
| "a set of discrete-time, pseudo-random, non-cyclostationary, and orthogonal and/or orthonormal waveforms" | Odyssey maintains that no construction is necessary for this term. This claim term should be afforded its plain and ordinary meaning. However, should the Court decide to construe this term, then Odyssey proposes the following construction: set of waveforms |

This term also raises the parties' dispute regarding the characteristics of the patents' signaling alphabet.  As with the other terms discussed above, Odyssey's position improperly seeks to read out the characteristics of the patents' waveform alphabet that allegedly distinguished it from the prior art.  (*See supra* § III.A; '169 patent, 4:34-44; '393 patent, 29:67-30:4, 30:45-47; Acampora Decl., ¶¶ 142-45.)

Claim 5 of the '940 patent recites "correlating the waveform sequence $\{U_k(nT)\}$ that is received by the receiver with a plurality of elements of a waveform alphabet."  As the received sequence of signals $\{U_k(nT)\}$ consists of pseudo-random, non-cyclostationary, and orthonormal waveforms, the receiver's waveform alphabet also necessarily has those features.  (Acampora Decl., ¶ 143.)  The claim context further supports Defendants' construction.  *Phillips*, 415 F.3d at 1314.

In the alternative, Odyssey proposes construing the term as a "set of waveforms."  Odyssey's alternative construction reads out not only the allegedly inventive characteristics of its waveform alphabet, but also the term "alphabet" entirely.  An alphabet is a standardized set of elements that each correspond to a specific information symbol.  (*See supra* § III.A; Acampora Decl., ¶ 144.)  An alphabet does not cover all possible sets of elements.  (Acampora Decl., ¶ 144.)

Accordingly, the Court should adopt Defendants' construction.

### 3. "radiating by the transmit antenna the baseband waveform sequence $\{U_k(nT)\}$" and related terms (Terms 28-30)

| Defendants' Construction (*e.g.*, Term 28) | Plaintiff's Construction (*e.g.*, Term 28) |
| --- | --- |
| "directly transmitting the baseband waveform sequence $\{U_k(nT)\}$ without up-conversion" | Odyssey maintains that no construction is necessary for this term. This claim term should be afforded its plain and ordinary meaning.<br><br>However, should the Court decide to construe this term, then Odyssey proposes the following construction:<br><br>"transmitting the baseband waveform sequence $\{U_k(nT)\}$" |

1    Term 28 expressly requires "*radiating* ... the *baseband* waveform sequence."

2   Yet Odyssey argues that the claim is so broad that it also encompasses radiating

3   waveforms at frequencies much higher than the baseband frequency.

4    "Baseband" has a well-established meaning in the field.  (Acampora Decl.,

5   ¶¶ 147-49.)  Before transmission in conventional wireless systems, signals are often

6   "up-converted" from the "baseband" frequency, which is centered around zero, to a

7   higher frequency called the "carrier" frequency.  (*Id.*)  Among other things, up-

8   conversion allows signals to be sent on different channels by using carriers with

9   different frequencies.  (*Id.*)  Once a signal is up-converted, it is no longer

10   considered a baseband signal by a person of skill in the art.  (*Id.*)

11    The claim language for Term 28 requires "radiating ... the baseband

12   waveform sequence" from the transmit antenna.  Odyssey's proposal conflicts with

13   the claim language, expanding the claim scope to cover devices that do not radiate

14   baseband waveform sequences but instead radiate up-converted, high-frequency

15   waveform sequences.

16    The written descriptions also support Defendants' construction.  The patents

17   include two alternative methods of transmission: (1) a method that includes up-

18   conversion from the baseband frequency and (2) a "direct synthesis" method that

19   excludes up-conversion and thus transmits the baseband waveform sequences.

20   ('169 patent, abstract, 2:16-17; Acampora Decl., ¶¶ 150-56.)  The up-conversion

21   method is shown in Figure 5, including the block labeled "Frequency Hop

22   Generator and Up-converter."  ('169 patent, Fig. 5; *id.*, Fig. 6 (receiver with inverse

23   "Down-Converter" circuitry).)  Figure 7 shows the direct synthesis method, which

24   sends the signal at the baseband frequency without any up-conversion block:

25       It will be appreciated that the transmitter embodiment of

26       FIG. 7 illustrates a "direct synthesis" transmitter in that

          *the transmitter directly synthesizes a transmitted*

27       *waveform, without resorting to up-conversion and/or*

28       *carrier modulation.*

(*Id.*, 8:21-25 (emphasis added); *id.*, Fig. 9 (receiver without down-converter).)

| '393 Patent, Fig. 5 (emphasis added) | '393 Patent, Fig. 7 (annotated) (Acampora Decl., ¶ 151) |
|---|---|
|  | |

Odyssey further distinguished between the direct synthesis and up-conversion methods, asserting that the direct synthesis method "may further enhance the LPI/LPD/LPE feature(s) of a communications system," the primary goal of the patents. (*Id.*, 8:25-27.) Odyssey explained in its proposals that up-conversion can be undesirable for covert communications:

> **EMISSIONS DEVOID OF CARRIER MODULATION**: ... [T]he XG-CSS waveform may be radiated by directly radiating the alphabet elements, without relying on carrier modulation and upconversion. Such a direct RF synthesis avoids radiating a double sideband carrier with correlated signal attractors between the upper and lower sidebands thereof, as would be the case by first forming the alphabet at baseband, followed by up-conversion.

(Ex. 15 at ODY0003059 (emphasis in original); *id.* at ODY003053 (transmitting at baseband may "preclud[e] correlation detection between carrier sideband"); Ex. 16 at ODY003643-44 ("The transmitter ... is a 'direct synthesis' transmitter in that it directly synthesizes (*at baseband*) the transmitted waveform, without resorting to up-conversion and/or carrier modulation.") (emphasis added).)

Despite using the word "baseband" in its proposed alternative construction, Odyssey seeks to cover not only direct synthesis systems that transmit at baseband but also systems that use up-conversion to transmit at higher carrier frequencies.

Pointing to the two embodiments discussed above, Odyssey argues that, "[i]f Defendants' proposal is adopted, the resulting claim construction would limit the scope of the invention to a single embodiment." (Dkt. 144, Ex. A at 72.)  As the Federal Circuit has made clear: "It is often the case that different claims are directed to and cover different disclosed embodiments.  The patentee chooses the language and accordingly the scope of the claims."  *Helmsderfer v. Bobrick Washroom Equip.*, 527 F.3d 1379, 1383-84 (Fed. Cir. 2008); *August Tech. v. Camtek*, 655 F.3d 1278, 1285-86 (Fed. Cir. 2011).  Here, these terms expressly require "*radiating ... the baseband waveform sequence*" and thus are limited to the direct synthesis embodiment, *i.e.*, transmitting at baseband (without up-conversion).

## C.   Claim Terms in the '393, '837, '606, and '230 Patents

1.   **"a processor that is configured [1] to provide a frequency content for a waveform by Fourier transforming a signal, [2] to form a desired spectrum shape for the waveform, that differs from the frequency content, responsive to the frequency and [3] to generate the waveform by inverse Fourier transforming the desired spectrum shape" and related terms (Terms 8-9, with Terms 1-3, 15-18)**

| Defendants' Construction (*e.g.*, Term 8) | Plaintiff's Construction (*e.g.*, Term 8) |
|---|---|
| "a processor that is configured (1) to identify the frequency content being radiated by other transmitters by subjecting the desired band of frequencies to a Fourier transform, (2) to form a water-filled spectrum shape, and (3) to create a waveform that is one of a set of pseudo-random, non-cyclostationary, and orthogonal and/or orthonormal waveforms by inverse Fourier transforming the desired spectrum shape"<br><br>**In the alternative:  Means-plus-function**<br><br>**Function:** See proposed construction above<br><br>**Structure:** Circuitry of Fig. 17, including: Power Spectrum Estimator (Fig. 17) to identify frequency content radiated by other transmitters, Water Filling Spectrum Shaper (WFSS), IFFT, Uniformly Distributed | Plain meaning |

| Random Phase Generator, and Gram-Schmidt Orthonormalizer, connected as in Fig. 17 | |

For these terms, Odyssey's "plain meaning" construction would improperly avoid resolving the parties' dispute over claim scope until trial and, at its core, seeks to expand the claim scope far beyond the alleged invention described in the patents and recited in the claims. As described above, the Federal Circuit has made clear that construction is required "when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *O2 Micro*, 521 F.3d at 1361. Moreover, a plain meaning construction may not be used to "divorce[]" the claim scope "from what the specification conveys is the invention." *Retractable*, 653 F.3d at 1305.

These claims relate to the water-filling method of creating the patents' signaling alphabet described in the '393 and '606 patents. (Acampora Decl., ¶¶ 158-76.) The method performs three steps. First, the method requires investigating the power radiated by other transmitters over the range of the frequencies the transmitter wishes to transmit on. ('393 patent, 30:5-44.) Closely following the claim language ("provide a frequency content"), the written description addressing the water-filling method describes how the Power Spectrum Estimator estimates the "frequency content being radiated by other transmitters." (*Id.*, 30:5-44.) In other words, the Power Spectrum Estimator samples the existing signals within a specified frequency range and provides the power level at each frequency. (*Id.*, Fig. 17; Acampora Decl., ¶¶ 165-67.)

Second, using interference level data from the Power Spectrum Estimator, the Water-Filling Spectrum Shaping step forms the desired spectrum shape. Again, closely following the claim language (forming a "desired spectrum shape" that is "responsive to the frequency" content), the specification describes how water filling forms a "Desired Spectrum Shape" that is "[r]esponsive to the output of the PSE [Power Spectrum Estimator]." ('393 patent, Fig. 17, 30:5-44.)

Figure 17 includes power spectral density diagrams showing how the desired spectrum shape is responsive to the measured frequency content.  As depicted below, the transmission power of the desired spectrum shape is high in frequency "bins" where the measured interfering frequency content is low, and the transmission power is low in frequency bins where the measured frequency content is high.  Thus, the desired spectrum shape is generally the inverse of the frequency content.  (Acampora Decl., ¶¶ 168-71.)

| '393 Patent, Fig. 17 (annotated excerpt) |
| --- |



Third, the transmitter "generates the waveform" for the signaling alphabet. As detailed above, the patents' alleged invention uses waveforms with pseudo-random, non-cyclostationary, and orthonormal characteristics.  Figure 17 shows three blocks used in generating waveforms with those characteristics: the first block generates M sequences of pseudo-random phase values; the second block combines those sequences with M copies of the desired spectrum shape and converts the frequency-domain signals into non-cyclostationary time-domain waveforms using an Inverse Fast Fourier Transform; and the third block orthonormalizes the set of waveforms using a Gram-Schmidt Orthonormalizer.  ('393 patent, Fig. 17, 30:5-44; Acampora Decl., ¶¶ 172-75.)

1
2
3
4
5



**'393 Patent, Fig. 17 (excerpt) (Acampora Decl., ¶ 172)**

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

The prosecution history also contradicts Odyssey's efforts to use a "plain meaning" construction to expand the claim scope beyond the alleged invention disclosed in the '393 and '606 patents.   (Acampora Decl., ¶¶ 177-84.)   While prosecuting a parent to the patents-in-suit, EICES acknowledged that a mathematical operation called an "Inverse Fast Fourier Transform" ("IFFT") is used both in the creation of its signaling alphabet and in prior art OFDM systems. Distinguishing the alleged invention from OFDM, EICES emphasized that OFDM's use of that mathematical operation "has *nothing to do* with the formation of a communications alphabet" but instead "has to do with the modulation of the data bits onto OFDM subcarriers."   ('354 File History, ODY_DEFS_00000958 (emphasis added).)   It likewise argued that any orthogonalizing performed in OFDM "*has nothing to do* with orthogonalizing random signals to create elements/symbols of a communications alphabet" and that any improvement to the modulation efficiency of OFDM systems "*has nothing to do* with forming a communications alphabet."   (*Id.* at ODY_DEFS_00000956, 958 (emphasis added).) Odyssey's "plain meaning" construction improperly seeks to expand the claim scope to accuse the same OFDM operations it distinguished during prosecution.

23
24
25
26
27
28

Finally, Terms 8 and 9 use a "processor configured to ..." formulation.  For the reasons given above for the "mapping" terms, the "processor configured to ..." language should be given means-plus-function treatment.  As a result, Defendants have provided an alternative means-plus-function construction, which construes the function as described above and construes the structure as the blocks from Figure

1    17 discussed above.  (Acampora Decl., ¶ 185.)

2          The same analysis applies to other closely related terms.  Terms 1-3 arise

3    from the '393 and '606 patents, with Terms 1 and 2 using almost identical language

4    to the first function discussed above for Term 8, and Term 3 using almost identical

5    language to the second function.[8]  (Acampora Decl., ¶¶ 186-91.)  Similarly, Terms

6    15-18 from all the patents-in-suit recite nearly identical language to the third

7    function discussed above for Term 8.[9]  (Acampora Decl., ¶¶ 208-10.)  Accordingly,

8    Terms 1-3 and 15-18 should be given the same construction as Terms 8 and 9 for

9    the reasons provided above.

10              **2.    Spectrum-shaping terms in the '230 and '837 patents**

11              **a.    '230 patent: "forming at baseband a desired spectrum**
12                      **shape" and related terms (Terms 4, 10)**

| Defendants' Construction (*e.g.*, Term 4) | Plaintiff's Construction (*e.g.*, Term 4) |
|---|---|
| "forming at baseband a water-filled spectrum shape or a power spectral density over a range of frequencies that substantially excludes certain frequency intervals in that range from providing frequency content" | Plain meaning |

18          As with the terms addressed above, Odyssey's "plain meaning" construction

19    seeks to expand the claim scope much broader than can be supported by the alleged

20    inventions in the specification.

21          Terms 4 and 10 from the '230 patent relate to the second function discussed

---

[8] *Compare* Term 1 ("providing a frequency content for a waveform by Fourier transforming a signal"), *with* Term 8 ("provide a frequency content for a waveform by Fourier transforming a signal"); *compare* Term 3 ("forming a desired spectrum shape for the waveform, that differs from the frequency content, responsive to the frequency content"), *with* Term 8 ("to form a desired shape for the waveform, that differs from the frequency content, responsive to the frequency").

[9] *Compare, e.g.*, Term 8 ("to generate the waveform by inverse Fourier transforming the desired spectrum shape"), *with* Term 15 ("generating the waveform by inverse Fourier transforming the desired spectrum shape").

above for Terms 8 and 9 of the '393 and '606 patents. The claims of the '230 patent, however, use different language from Terms 8 and 9. The '230 claims first remove the step requiring the transmitter to measure the interference from other transmitters by "providing a frequency content for a waveform by Fourier transforming a signal." Next, the '230 claims require forming a desired spectrum shape, but remove the requirement that the desired spectrum shape be different from, but responsive to, the measured frequency content of the interference.

Odyssey's proposed "plain meaning" construction seeks to enlarge the claim scope to cover any type of spectrum shaping, but the '230 specification does not support claim scope that broad.[10] (Acampora Decl., ¶¶ 193-98.) In addition to the Figure 17 water-filling method discussed above, the '230 patent includes Figure 8 and a few lines of text. Figure 8 shows "a schematic illustration of spectrum used by a transmitter."[11] ('230 patent, 16:15-17.) The upper figure depicts "a power spectral density of a broadband waveform defining the M-ary non-cyclostationary orthonormal alphabet." (*Id.*, 24:58-65.) The bottom figure (the "second trace") shows a spectrum shape where two frequency intervals have been "substantially excluded" to address known interference, such as from GPS signals:

> As is further illustrated in FIG. 8 (second trace), certain frequency intervals that warrant protection (or additional protection) from interference, such as, for example, a GPS frequency interval, may be substantially excluded from providing frequency content for the generation of the M-ary non-cyclostationary orthonormal alphabets.

('837 patent, 25:5-11.)[12]

---

[10] *Netword v. Centraal*, 242 F.3d 1347, 1352 (Fed. Cir. 2001) ("The claims are directed to the invention that is described in the specification; they do not have meaning removed from the context from which they arose.").

[11] The '230 patent also discusses the term "spectrum" in describing the spread-spectrum techniques in the prior art. (*E.g.*, '230 patent, 2:1-21.)

[12] While both Figures 8 and 17 form a desired spectrum shape, only Figure 17 forms a spectrum shape that is responsive to the frequency content. Figure 8





Based on the specification, the claim scope should be consistent with the Figure 17 water-filling and Figure 8 power-spectral-density disclosures.

Finally, apparatus Term 10 uses the "processor configured to ..." formulation and thus should be given means-plus-function treatment for the reasons discussed above.  Applying means-plus-function law to Term 10 properly limits the claim scope to the water-filling method disclosed in Figure 17, because the '230 patent does not describe any structure for performing the power-spectral-density shaping from Figure 8.  (Acampora Decl., ¶¶ 199-200.)

### b. '837 patent: "forming a desired spectrum shape for a waveform" and related terms (Terms 6, 12)

| Defendants' Construction (*e.g.*, Term 6) | Plaintiff's Construction (*e.g.*, Term 6) |
|---|---|
| "forming a power spectral density over a range of frequencies that substantially excludes certain frequency intervals from providing frequency content" | Plain meaning |

For this term, Odyssey again seeks a "plain meaning" construction to enlarge the claim scope beyond the invention described in the patent.  The '837 patent includes shaping language similar to the '230 terms discussed above.  A key

instead shapes the spectrum by excising known interfering frequencies, such as GPS, without any measurements.  Figure 8 thus lacks the responsiveness critical to water-filling and required by the '393 and '606 claims.  In addition, the '230 patent does not describe how the transmitter is supposed to exclude those frequencies in the context of its alleged invention (the '393 and '606 patents teach using a Fourier transform for the step of providing a frequency content) or enable such a transmitter; it just asserts that the frequencies could be excluded. (Acampora Decl., ¶ 197.)

difference between the '837 and '230 patents, however, is that Odyssey expressly and intentionally did not include the Figure 17 water-filling disclosure in the '837 patent.[13]  (Acampora Decl., ¶¶ 202-06, Ex. A ('837 File History).)

Here, forming a spectrum shape by excluding frequencies from the power spectral density as in Figure 8 is not just a preferred embodiment, it is the '837 patent's only embodiment of the claim term.  *Abbott Labs.*, 566 F.3d at 1289 (construing claim scope to include the only disclosed embodiment); *Respironics v. Invacare*, 303 F. App'x 865, 870 (Fed. Cir. 2008) (affirming claim construction that limited claim scope to the "only one way" disclosed of achieving the claimed functionality).

Accordingly, the proper construction of this term is "forming a power spectral density over a range of frequencies that substantially excludes certain frequency intervals from providing frequency content."  In addition, Term 12 uses the "processor that is configured to ..." format and thus invokes means-plus-function case law.  Because the '837 patent does not provide any structure for performing the functions of the Figure 8 method, the claims including Term 12 are indefinite.  (Acampora Decl., ¶ 205.)

> **3.** **"selecting a frequency interval over which a waveform U(nT) is to exist; wherein n denotes a discrete time index and wherein n=1, 2, ... , N; allowing at least one frequency that is included in the selected frequency interval to provide a frequency content to the waveform U(nT); excluding at least one frequency that is included in the selected frequency**

---

[13] None of the passages cited by Odyssey for forming a waveform apply to forming a desired spectrum shape.  (*E.g.*, '837 patent, 4:19-20, 6:26-27, 9:48-50, 11:61-62, 20:14-21.)  The disputed claim limitation, "forming a desired spectrum shape for a waveform," also includes the term "waveform."  However, here, the term "waveform" is used as a qualifier for the term "spectrum shape."  It is a "well-established rule that claims are interpreted with an eye toward giving effect to all terms in the claim."  *Digital-Vending Servs. Int'l v. Univ. of Phoenix*, 672 F.3d 1270, 1275 (Fed. Cir. 2012) (internal quotation omitted).  Thus, forming a spectrum shape is not the same as forming a waveform.

1
2
3
4

**interval from providing a frequency content to the waveform U(nT); forming the waveform U(nT) comprising a plurality of elements U(T), U(2T), ... , U(NT), corresponding to respective integer values 1, 2, ... , N of the discrete time index n" and related terms (Terms 5, 7)**

5

| Defendants' Construction (*e.g.*, Term 7) | Plaintiff's Construction (*e.g.*, Term 7) |
|---|---|
| "determining the frequencies over which a waveform in a set of pseudo-random, non-cyclostationary waveforms will have content by creating a power spectral density over a frequency interval that substantially excludes certain frequency intervals from providing frequency content" | Plain meaning |

6
7
8
9
10

11   Term 7 appears in claim 17 and 22 of the '837 patent.[14]  Plaintiff's proposed

12   "plain meaning" construction does nothing to explain *how* the claimed selecting,

13   allowing, excluding, and forming are accomplished.  It would not resolve the

14   parties' dispute but would instead improperly shift to the jury the question of the

15   term's meaning.  *O2 Micro*, 521 F. 3d at 1360.  Defendants' construction provides

16   the necessary clarity for the Court and jury.  (Acampora Decl., ¶¶ 212-16.)

17   This term relates to creating "a power spectral density" for "U(nT)," which is

18   the waveform "defining the M-ary non-cyclostationary, orthonormal alphabet," as

19   discussed above.  ('837 patent, 23:55-58, 3:48-49, 5:56-57, 9:7-8, 11:24-25

20   (equating "frequency content" to "power spectral density").)  The '837 patent

21   shows only one way to perform the claimed functions: providing frequency content

22   to U(nT) by creating a power spectral density and "excluding at least one frequency

23   that is included in the selected frequency interval."  (*Id.*, 23:55-24:6.)

24   As detailed above, only Figure 8 discloses creating and then limiting a power

25
26
27
28

---

[14] This term is similar to Term 5, which appears in the '230 patent.  The specifications of the '837 and '230 patents, however, differ because the '230 patent includes disclosure of a water-filling technique not included in the '837 patent (*see supra* § III.C.2.a), which accounts for the difference between Defendants' construction of Term 5 as compared to Term 7.

1  spectral density.  The top of Figure 8 illustrates that a waveform can "exist" in a

2  power spectrum.  (*Id.*, 23:55-60.)  The bottom of Fig. 8 shows the power spectrum

3  excluding two frequency ranges in the selected frequency interval.  (*See supra*

4  § III.C.2.a (Fig. 8 (annotated)).)  "As is further illustrated in FIG. 8 (second trace),

5  *certain frequency intervals* that warrant protection (or additional protection) from

6  interference, such as, for example, a GPS frequency interval, *may be substantially*

7  *excluded from providing frequency content* for the generation of the M-ary non-

8  cyclostationary orthonormal alphabets."  ('837 patent, 23:67-24:6 (emphasis

9  added).)  The claim term mirrors this description nearly identically.

10       The prosecution history confirms Defendants' construction.

11  EICES represented that the '837 patent claims were supported by Figure 8 and the

12  exact section of the specification relied upon by Defendants.  ('837 File History,

13  ODY0000259.)  EICES cited no other sections and made no other arguments.

14       Odyssey's additional citations to the specification add nothing to the analysis

15  of this term.  Therefore, the Court should adopt Defendants' construction since it is

16  the only one supported by the intrinsic evidence in this case.  Term 7 should be

17  construed as "determining the frequencies over which a waveform in a set of

18  pseudo-random, non-cyclostationary waveforms will have content by creating a

19  power spectral density over a frequency interval that substantially excludes certain

20  frequency intervals from providing frequency content."

21  **IV. CONCLUSION**

22       For the reasons above, Defendants respectfully request that the Court adopt

23  their proposed constructions.

24

25

26

27

28

| | |
|---|---|
| 1 | Dated:  February 25, 2016 |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |

Dated:  February 25, 2016

*/s/ Timothy S. Teter*
TIMOTHY S. TETER (171451)
(teterts@cooley.com)
BENJAMIN G. DAMSTEDT (230311)
(bdamstedt@cooley.com)
LOWELL D. MEAD (223989)
(lmead@cooley.com)
PRIYA VISWANATH (238089)
(pviswanath@cooley.com)
DENA CHEN (286452)
(dchen@cooley.com)
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304
Tel:  650-843-5000
Fax:  650-849-7400

Attorneys for Defendant Apple Inc.

Dated:  February 25, 2016

*/s/ Christopher W. Kennerly*
Christopher W. Kennerly
California Bar No. 25593
PAUL HASTINGS LLP
1117 S. California Avenue
Palo Alto, CA 94304
Telephone:  (650) 320-1800
Facsimile:  (650) 320-1900
chriskennerly@paulhastings.com

Steven L. Park (admitted pro hac vice)
PAUL HASTINGS LLP
1170 Peachtree Street, Suite 100
Atlanta, Georgia 30309
Telephone:  (404) 815-2400
Facsimile:  (404) 815-2424
stevenpark@paulhastings.com

Attorneys for Defendants
Samsung Electronics Co., Ltd. and
Samsung Electronics America, Inc.

| | |
|---|---|
| 1 | Dated:  February 25, 2016 |

Dated:  February 25, 2016

*/s/ Dale J. Giali*
Dale J. Giali (SBN 150382)
dgiali@mayerbrown.com
Mayer Brown LLP
350 South Grand Avenue, 25th Floor
Los Angeles, CA  90071-1503
Telephone:  (213) 229-9500
Facsimile:  (213) 625-0248

A. John P. Mancini (*pro hac vice*)
jmancini@mayerbrown.com
Amr O. Aly (*pro hac vice*)
aaly@mayerbrown.com
Jeong Ah Joy Lee (*pro hac vice*)
joylee@mayerbrown.com
Mayer Brown LLP
1221 Avenue of the Americas
New York, NY 10020-1001

Attorneys for Defendant
Motorola Mobility LLC

Dated:  February 25, 2016

*/s/ Brian A. Tollefson*
Brian A. Tollefson (pro hac vice)
Steven M. Lieberman (pro hac vice)
Joo Mee Kim (pro hac vice)
Rothwell Figg Ernst & Manbeck PC
607 14th Street, Suite 800
Washington D.C. 20005
Telephone:  (202) 783-6040
Facsimile:  (202) 783-6031

Jeffrey D. Lewin (SBN 68202)
Sullivan Hill Lewin Rez & Engel
550 West C Street, Suite 1500
San Diego, CA  92101-3540
Telephone:  (619) 233-4100
Facsimile:  (619) 231-4372

Attorneys for Defendants
LG Electronics U.S.A., Inc.,
LG Electronics, Inc. and
LG Electronics Mobilecomm U.S.A., Inc.

1

## **CERTIFICATE OF SERVICE**

2      The undersigned certifies that counsel of record who are deemed to have

3   consented to electronic service are being served on February 25, 2016, with a copy

4   of this document via the Court's CM/ECF system per Local Rules.   Any other

5   counsel will be served by electronic means, facsimile, overnight delivery and/or

6   first class mail on this date.

7                                          By: */s/ Timothy S. Teter*_____

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28