COOLEY LLP
TIMOTHY S. TETER (171451)
(teterts@cooley.com)
MATTHEW J. BRIGHAM (191428)
(mbrigham@cooley.com)
BENJAMIN G. DAMSTEDT (230311)
(bdamstedt@cooley.com)
LOWELL D. MEAD (223989)
(lmead@cooley.com)
PRIYA VISWANATH (238089)
(pviswanath@cooley.com)
DENA CHEN (286452)
(dchen@cooley.com)
3175 Hanover Street
Palo Alto, CA 94304
Tel:  650-843-5000
Fax:  650-849-7400

Attorneys for Defendant
APPLE INC.

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ODYSSEY WIRELESS, INC., | Case No.  3:15-CV-01735-H-RBB |
| Plaintiff, | |
| v. | **APPLE INC.'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW** |
| APPLE INC., | |
| Defendant. | Trial:     November 1, 2016<br>Judge:   Hon. Marilyn L. Huff |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................ 1

II.   PATENT CASE DISCLOSURES (CIV. L.R. 16.1.F.3.E). ................................. 1

     A.    Invalidity (Civ. L.R. 16.1.f.3.e(1)) ............................................................ 1

         1.    Points of law ...................................................................... 2

             a.    The Court's claim constructions........................... 2

             b.    Anticipation ......................................................... 2

             c.    Obviousness......................................................... 3

             d.    Section 112 .......................................................... 4

             e.    Invention date ..................................................... 6

         2.    Material facts ...................................................................... 8

             a.    The asserted claims............................................. 8

             b.    The teachings of the claims of the patents-in-suit............... 9

             c.    Person of ordinary skill .................................... 10

             d.    The prior art invalidates the asserted claims. .................... 10

             e.    Secondary considerations further confirm the obviousness of the asserted claims. .................................. 17

             f.    The asserted claims are not entitled to a pre-filing invention date. ................................................... 18

             g.    The asserted claims are not entitled to claim priority before March 2008. ......................................... 19

             h.    The asserted claims are also invalid under 35 U.S.C. § 112. .............................................................. 19

     B.    Noninfringement (Civ. L.R. 16.1.f.3.e(3)).............................................. 21

         1.    Points of law .................................................................... 21

             a.    Literal infringement........................................... 21

             b.    Infringement under the doctrine of equivalents ................ 22

             c.    Inducement of infringement .............................. 22

         2.    Material facts .................................................................... 23

             a.    The accused Apple products.............................. 23

**TABLE OF CONTENTS**
**(continued)**

Page

b.   The accused Apple products do not literally infringe. ....... 23

c.   Odyssey did not preserve a doctrine-of-equivalents
theory. ................................................................................ 25

d.   Apple has not induced infringement. ................................. 26

e.   Odyssey did not allege willful infringement. ..................... 26

III.   ADDITIONAL DISCLOSURES OF MATERIAL FACTS AND LAW
(CIV. L.R. 16.1.F.2). ....................................................................... 26

A.   General Disclosures (Civ. L.R. 16.1.f.2.a) ................................. 26

1.   Damages .............................................................................. 26

a.   Points of law ....................................................... 27

b.   Material facts ...................................................... 28

(1)   Odyssey has not shown that its alleged
inventions provide any value to Apple or its
customers over the prior art. ................................. 28

(2)   Comparable agreements ........................................ 29

(3)   Smallest-salable-unit analysis and royalty
stacking .................................................................. 29

(4)   Odyssey's experts seek to present unreliable
opinions that do not provide any basis for
evaluating damages. ............................................... 30

2.   Standing .............................................................................. 30

a.   Points of law ....................................................... 30

b.   Material facts ...................................................... 31

B.   Abandoned Issues (Civ. L.R. 16.1.f.2.b) ................................... 31

C.   Exhibit List (Civ. L.R. 16.1.f.2.c) ............................................. 31

D.   Witnesses (Civ. L.R. 16.1.f.2.d) ............................................... 32

## I.   INTRODUCTION

Pursuant to the Scheduling Order (Dkt. 111) and the Civil Local Rules, including Civ. L.R. 16.1.f.2 and 16.1.f.3.e, Apple hereby provides its Memorandum of Contentions of Fact and Law.  The Final Pretrial Conference is scheduled for October 21, 2016.  Apple reserves the right to amend these disclosures, including as a result of the meet and confer between the parties, additional rulings from the Court, and in response to the additional pending discovery resulting from Defendants' motion to compel.  Apple further identifies its filings in this case, including its claim construction briefing, its motion to dismiss, motions for summary judgment and *Daubert* motion, its contentions and discovery responses, and its expert reports as providing further details regarding its contentions of fact and law.

## II.   PATENT CASE DISCLOSURES (CIV. L.R. 16.1.F.3.E).

### A.   Invalidity (Civ. L.R. 16.1.f.3.e(1))

At trial, Apple intends to introduce evidence regarding invalidity from a variety of sources, including exhibits and witness testimony.  Witnesses that may testify regarding invalidity issues, such as the scope of the prior art, include Apple's expert witness, Dr. Anthony Acampora and, on cross-examination, Odyssey's expert, Dr. Mung Chiang.  Several fact witnesses may also testify regarding the state and scope of the prior art, the level of skill in the art, and other invalidity issues, including Dr. Carl Andren, Dr. Hyung Myung, Sachin Sane, Sami Almalfouh, Dr. Robert Love.

Apple provides the following short summary regarding the invalidity of the asserted claims.  In addition, the disclosures from Apple's expert reports, its invalidity contentions, its discovery responses, and the depositions of the witnesses identified above are incorporated by reference, including the additional prior art references discussed therein.  The specific combinations of prior art references, as

well as evidence regarding secondary considerations, are also described in Apple's disclosures, discovery responses, and expert reports.

### 1.    Points of law

#### a.    The Court's claim constructions

The Court has addressed disputes between the parties regarding claim scope. (*E.g.*, Dkt. 169; Dkt. 322 at 19-22 & n.6.)  In addition, Odyssey's rebuttal invalidity report presented several additional arguments about claim scope, which have not yet been addressed.

#### b.    Anticipation

A patent is anticipated if a prior art reference discloses all of the elements, expressly or inherently.  35 U.S.C. § 102.  Under § 102(b), a patent is invalid if "the invention was patented or described in a printed publication in this or a foreign country ... more than one year prior to the date of the application for patent in the United States ...." 35 U.S.C. § 102(b) (pre-AIA version applicable to patents-in-suit).  "Whether a given reference is a 'printed publication' depends on whether it was 'publicly accessible' ...." *Bruckelmyer v. Ground Heaters*, 445 F.3d 1374, 1378 (Fed. Cir. 2006).  "Accessibility goes to the issue of whether an interested member of the relevant public could obtain the information if they wanted to." *Constant v. Advanced Micro-Devices*, 848 F.2d 1560, 1569 (Fed. Cir. 1988).  "[A] reference can anticipate a claim even if it 'd[oes] not expressly spell out' all the limitations arranged or combined as in the claim, if a person of skill in the art, reading the reference, would 'at once envisage' the claimed arrangement or combination." *Kennametal v. Ingersoll Cutting Tool*, 780 F.3d 1376, 1381 (Fed. Cir. 2015) (quoting *In re Petering*, 301 F.2d 676, 681 (C.C.P.A. 1962)).  In addition, to anticipate, "the reference need not satisfy an *ipsissimis verbis* test." *In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009) (citing *In re Bond*, 910 F.2d 831, 832 (Fed. Cir. 1990)).  "[A] prior art reference may anticipate when the claim limitation or limitations not expressly found in that reference are nonetheless

1  inherent in it." *Leggett & Platt v. VUTEK*, 537 F.3d 1349, 1354 (Fed. Cir. 2008)

2  (quoting *MEHL/Biophile Int'l v. Milgraum*, 192 F.3d 1362, 1365 (Fed. Cir. 1999)).

3                          **c.    Obviousness**

4           A patent is obvious if "the differences between the subject matter sought to

5  be patented and the prior art are such that the subject matter as a whole would have

6  been obvious at the time the invention was made to a person having ordinary skill

7  in the art to which said subject matter pertains."   35 U.S.C. § 103(a); *KSR v.*

8  *Teleflex*, 550 U.S. 398, 406 (2007).  Obviousness is a question of law based on (1)

9  the scope and content of the prior art, (2) the differences between the claims and

10 prior art, (3) the level of ordinary skill in the pertinent art, and (4) objective indicia

11 of nonobviousness. *See Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-

12 18 (1966).  "[T]he combination of familiar elements according to known methods is

13 likely to be obvious when it does no more than yield predictable results," thus the

14 question is "whether the improvement is more than the predictable use of prior art

15 elements according to their established functions."  *KSR*, 127 S. Ct. at 1731.

16          The Federal Circuit has repeatedly held that secondary factors cannot trump a

17 strong prima facie case of obviousness, as in this case.  *Ohio Willow Wood v. Alps*

18 *South*, 735 F.3d 1333, 1344 (Fed. Cir. 2013) (affirming summary judgment of

19 obviousness – "[W]here a claimed invention represents no more than the

20 predictable use of prior art elements according to established functions, as here,

21 evidence of secondary indicia are frequently deemed inadequate to establish non-

22 obviousness."); *Tyco Healthcare Grp. v. Mut. Pharm.*, 642 F.3d 1370, 1377 (Fed.

23 Cir. 2011) (affording "little weight" to testimony that inventor's experimental

24 results would have been surprising at the time based on the "lack of support in the

25 record for [expert's] interpretation of the prior art).  In addition, "[a] nexus between

26 ... [secondary factors] and the claimed features is required" before secondary

27 considerations can dislodge the determination. *Brown & Williamson Tobacco Corp*

28 *v. Philip Morris Inc.*, 229 F.3d 1120, 1130 (Fed. Cir. 2000).

Odyssey's enablement arguments are irrelevant to obviousness. "Even if a reference discloses an inoperative device, it is prior art for all that it teaches." *Beckman Instruments v. LKB Produkter*, 892 F.2d 1547, 1551 (Fed. Cir. 1989). Even if the reference was not enabling per se, "a non-enabling reference may qualify as prior art for the purpose of determining obviousness under 35 U.S.C. 103." *Symbol Techs. v. Opticon*, 935 F.2d 1569, 1578, 19 USPQ2d 1241, 1247 (Fed. Cir. 1991).

### d.    Section 112

The Federal Circuit has expressly cautioned patentees: "[B]eware of what one asks for." *Liebel-Flarsheim v. Medrad*, 481 F.3d 1371, 1380 (Fed. Cir. 2007). In seeking broad claim scope, a patentee can extend the scope of the claim past the scope of the described and enabled embodiments and render the claim invalid. *Id*; *Sitrick v. Dreamworks*, 516 F.3d 993, 999 (Fed. Cir. 2008) (requiring "full scope"); *LizardTech v. Earth Res. Mapping*, 424 F.3d 1336, 1344-45 (Fed. Cir. 2005). The Section 112 requirements prevent the scope of the claims from "overreach[ing] the scope of the inventor's contribution." *Ariad Pharms. v. Eli Lilly & Co.*, 598 F.3d 1336, 1353-54 (Fed. Cir. 2010) (*en banc*). "Tossing out the mere germ of an idea" and discussing a "mere wish or plan" does not meet the written description requirement. *Genentech v. Novo Nordisk*, 108 F.3d 1361, 1366 (Fed. Cir. 1997); *Ariad*, 598 F.3d at 1350, 1356; *Auto. Techs. Int'l v. BMW of N. Am.*, 501 F.3d 1274, 1282 (Fed. Cir. 2007) (mechanical sensor disclosure inadequate for broad claim that covered both electronic sensors and mechanical sensors).

Section 112 requires that "[t]he specification shall contain a written description of the invention." 35 U.S.C. § 112(a). "To fulfill the written description requirement, the patent specification must describe an invention in sufficient detail that one skilled in the art can *clearly conclude* that the inventor invented what is claimed." *Cordis v. Medtronic Ave*, 339 F.3d 1352, 1364 (Fed. Cir. 2003) (emphasis added). "[T]he test for sufficiency is whether the disclosure

of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad*, 598 F.3d at 1351. "It is not sufficient for purposes of the written description requirement of § 112 that the disclosure, when combined with the knowledge in the art, would lead one to speculate as to modifications that the inventor might have envisioned, but failed to disclose." *Anascape v. Nintendo of Am.*, 601 F.3d 1333, 1340 (Fed. Cir. 2010) (*quoting Lockwood v. American Airlines*, 107 F.3d 1565, 1572 (Fed. Cir. 1997)).

"The essence of the written description requirement is that a patent applicant, as part of the bargain with the public, must describe his or her invention so that the public will know what it is and that he or she has truly made the claimed invention." *AbbVie Deutschland GmbH & Co. v. Janssen Biotech*, 759 F.3d 1285, 1298 (Fed. Cir. 2014). The written description requirement "serves a teaching function, as a *quid pro quo* in which the public is given meaningful disclosure in exchange for being excluded from practicing the invention for a limited period of time." *Univ. of Rochester v. G.D. Searle & Co.*, 358 F.3d 916, 922 (Fed. Cir. 2004) (citation omitted). Courts enforce the written description requirement to "ensure that the scope of the right to exclude, as set forth in the claims, does not overreach the scope of the inventor's contribution to the field of art as described in the patent specification." *Reiffin v. Microsoft*, 214 F.3d 1342, 1345 (Fed. Cir. 2000). Therefore, it is critical that the specification provide written description of the full scope of the claims. *See Chiron v. Genentech*, 363 F.3d 1247, 1259 (Fed. Cir. 2004) ("An application satisfies the written description requirement if persons of ordinary skill in the art at the time the application was filed would recognize from the application that the inventor actually invented the full scope of the invention as finally claimed in the patent."); *Crown Operations Int'l v. Solutia*, 289 F.3d 1367, 1380 (Fed. Cir. 2002) ("[T]he novel aspects of the invention must be disclosed and not left to inference, that is, a patentee may not rely on inference of a person of

1   ordinary skill in the pertinent art to supply such novel aspects ....").

2   The "enablement requirement is satisfied when one skilled in the art, after

3   reading the specification, could practice the claimed invention without undue

4   experimentation." *Auto. Techs.*, 501 F.3d at 1282. "It is the specification, not the

5   knowledge of one skilled in the art, that must supply the novel aspects of an

6   invention in order to constitute adequate enablement." *Genentech*, 108 F.3d at

7   1366. The patentee is "required to provide an adequate enabling disclosure in the

8   specification; it cannot simply rely on the knowledge of a person of ordinary skill to

9   serve as a substitute for the missing information in the specification." *Alza v. Andrx*

10  *Pharms.*, 603 F. 3d 935, 940-41 (Fed. Cir. 2010). "A patentee who chooses broad

11  claim language must make sure the broad claims are fully enabled." *Sitrick*, 516

12  F.3d at 999-1000.

13  The claims in a later-filed application can take advantage of the filing date of

14  an earlier application (and thus avoid prior art arising between the applications)

15  only if the earlier application complies with the requirements of section 112.

16  *Tronzo v. Biomet*, 156 F.3d 1154, 1158 (Fed. Cir. 1998) ("For a claim in a later-

17  filed application to be entitled to the filing date of an earlier application under 35

18  U.S.C.A. § 120, the earlier application must comply with the written description

19  requirement of 35 U.S.C.A. § 112, ¶ 1."); *Anascape*, 601 F.3d at 1335-37; *Tech.*

20  *Licensing v. Videotek*, 545 F.3d 1316, 1326 (Fed. Cir. 2008).

21  ### e.   Invention date

22  In order to claim a pre-filing invention date, a plaintiff must "show that it

23  was the first to conceive the invention and that it exercised reasonable diligence in

24  later reducing that invention to practice." *Mahurkar v. C.R. Bard*, 79 F.3d 1572,

25  1577 (Fed. Cir. 1996). "To have conceived of an invention, an inventor must have

26  formed in his or her mind 'a definite and permanent idea of the complete and

27  operative invention, as it is hereafter to be applied in practice.'" *Id.* (quoting

28  *Burroughs Wellcome v. Barr Labs.*, 40 F.3d 1223, 1228 (Fed. Cir. 1994)). "The

idea must be 'so clearly defined in the inventor's mind that only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation.'" *Id.* (quoting *Burroughs Wellcome*, 40 F.3d at 1228). To show reasonable diligence, a plaintiff must account for the entirety of the critical period with specific details. *See In re Mulder*, 716 F.2d 1542, 1545 (Fed. Cir. 1983) (failure to show diligence during a two-day critical period was fatal).

In addition to showing conception and diligence requirements, "[t]he inventor must provide independent corroborating evidence in addition to his own statements and documents." *Procter & Gamble v. Teva Pharms. USA*, 566 F.3d 989, 999 (Fed. Cir. 2009) (citation and internal quotation omitted) ("unwitnessed" notebook entry cannot establish invention date); *In re Jolley*, 308 F.3d 1317, 1328 (Fed. Cir. 2002) ("corroboration is required to support an inventor's testimony regarding his reasonable diligence in pursuit of the invention"); *Kenexa Brassring v. Taleo*, 751 F. Supp. 2d 735, 755 (D. Del. 2010) ("[T]o prove both conception and reduction to practice, an alleged prior inventor 'must provide independent corroborating evidence in addition to his own statements and documents.'") (citation omitted).

Corroboration requires "evidence showing what the inventor has disclosed to others." *Cordance v. Amazon.com*, 658 F.3d 1330, 1334 (Fed. Cir. 2011) (citation omitted) (emphasis added). "[A]n inventor's own unwitnessed documentation does not corroborate an inventor's testimony about inventive facts." *Brown v. Barbacid*, 276 F.3d 1327, 1335 (Fed. Cir. 2002) ("The inventive facts must not rest alone on testimonial evidence from the inventor himself."); *Alexsam v. Gap*, 621 F. App'x 983, 992 (Fed. Cir. 2015). Corroboration "provides a bright line for both district courts and the PTO to follow in addressing the difficult issues related to invention dates." *Mahurkar*, 79 F.3d at 1577; *Monolithic Power Sys. v. O2 Micro Int'l*, No. 08-4567, 2010 WL 583960, at *8-9 (N.D. Cal. Feb. 16, 2010).

Odyssey has mistakenly argued that Karabinis' notebook "alone" is enough

and the "rule of reason" saves its "unwitnessed" notebook.  (Dkt. 287 (MSJ Opp. at 23, 25).)   But "the 'rule of reason' analysis does not alter the requirement of corroboration of an inventor's testimony."  *Singh v. Brake*, 317 F.3d 1334, 1341-43 (Fed. Cir. 2003) (notebook insufficient to corroborate inventor's testimony); *Stern v. Trs. of Columbia Univ.*, 434 F.3d 1375, 1378 (Fed. Cir. 2006) ("unwitnessed laboratory notebooks on their own are insufficient"); *Reese v. Hurst*, 661 F.2d 1222, 1231 (C.C.P.A. 1981) ("notebooks are accorded no more weight than the inventors' testimony in this instance, since they were not witnessed or signed …."); *Alexsam*, 621 F. App'x at 995 (patentee unable to show an earlier conception date because it had no corroborating evidence); *Stamps.com v. Endicia*, 437 F. App'x 897, 908 (Fed. Cir. 2011) (to safeguard against fraud, inventor "claiming prior conception must proffer evidence corroborating his testimony").

## 2.   Material facts

### a.   The asserted claims

After Plaintiff Odyssey dropped scores of asserted claims and one asserted patent in its entirety, the following claims from five patents remain in the suit:

| U.S. Patent No. | Asserted Claims |
|---|---|
| 7,881,393 | 4 (depends from 1) <br> 18 (depends from 15) |
| 8,199,837 | 1, 6, 11, 14 (independent) <br> 21 (depends from 17) <br> 27 (depends from 22) |
| 8,576,940 | 2 (depends from 1) <br> 11 (depends from 10) |
| 8,855,230 | 11 (depends from 1) <br> 22 (depends from 12) <br> 31 (depends from 23) <br> 42 (depends from 34) <br> 50 (depends from 45) <br> 64 (depends from 58) |

| U.S. Patent No. | Asserted Claims |
|---|---|
| 8,879,606 | 4 (depends from 1) <br> 17 (depends from 14) <br> 30 (depends from 27) <br> 44 (depends from 40) |

### b.  The teachings of the claims of the patents-in-suit

The five patents-in-suit arise from applications that purport to claim priority to provisional applications filed in June 2005, July 2005, and March 2008.   The patents-in-suit describe a "signaling alphabet" made up of waveforms.  ('393 col. 2:16-43 (Summary of the Invention); '393 col. 19:55-20:15.)  Figure 1 from the patents-in-suit shows "generat[ing] a communications alphabet comprising M distinct pseudo-random, non-cyclostationary, orthogonal and/or orthonormal waveforms."  ('393 Fig. 1, col. 20:21-21:52; '393 Fig. 3, col. 20:66-21:3.)  Fig. 8 notes that certain frequency intervals may be excluded from the waveforms included in the waveform alphabet.  ('393 Fig. 8, col. 24:44-64)   Three of the patents-in-suit also include Figure 17.   ('393, '230, '606 patents, Fig. 17.) Figure 17 depicts a "cognitive" embodiment in which the channel conditions of a band of frequencies are analyzed using a Fourier transform, and water-filling is used to form a desired spectrum shape for the waveforms in the waveform alphabet. ('393 Fig. 17, col. 30:5-53.)

The patents-in-suit use the waveform alphabet to map information symbols onto waveforms.  Figure 7 shows a transmitter path using the waveform alphabet. ('393 Fig. 7, col. 24:18-27; *see also* '393 Fig. 5, col. 23:29-54; '393 Fig. 17, col. 30:5-31:27.)  The waveform alphabet is used to map each information symbol onto a corresponding waveform from the waveform alphabet.  ('393 Fig. 4, col. 22:40-49 ("[A]n information symbol $I_k$ ... having one of M possible information values $\{I_1, I_2, ... , I_M\}$, may be mapped onto one of the M waveforms of the alphabet $\{U_1(nT),$

$U_2(nT)$, [...] $U_M(nT)\}$ .... For example, in some embodiments, if $I_k = I_2$, then during the $k^{th}$ signaling interval the waveform $U_2(nT)$ may be transmitted ....”); ‘393 col. 22:37-65.)

**‘393 Fig. 7 (annotated)**



FIGURE 7

### c.     Person of ordinary skill

A person of ordinary skill in the art of the patents-in-suit is a person with at least a master's degree in electrical engineering with approximately 3-4 years of practical experience in wireless communications, or the equivalent thereof.

### d.     The prior art invalidates the asserted claims.

A variety of prior art references teach the alleged inventions recited in the asserted claims. For example, the Pickering reference (U.S. Patent No. 6,408,019) teaches a “noise communication system” for use in both commercial and military systems to transmit “secret” information. (*E.g.*, Pickering, abstract, col. 1:22-32, 3:52-4:37.) Pickering is titled “System and Method for Communication Using Noise,” was filed on December 23, 1998, and issued on June 18, 2002, more than one year before the earliest application in the family of the patents-in-suit. Pickering is discussed in detail in the Acampora invalidity report, including Appendix A and throughout the main body of his report, with claim-by-claim and

1   limitation-by-limitation mapping shown in the claim mapping chart for the '940

2   patent.  The rebuttal report of Odyssey's expert presents arguments that misread

3   Pickering.  The report also relies on belated and mistaken claim construction

4   arguments regarding the frequency-content and bandwidth limitations that conflict

5   with Odyssey's infringement, damages, and priority-date theories.

6       The Andren reference (U.S. Patent No. 5,029,184) teaches a water-filling

7   method that closely tracks the "cognitive" water-filling method described in three

8   of the patents-in-suit and covered by Odyssey's asserted claims.  (*E.g.*, Andren,

9   Fig. 2, col. 5:44-6:51, claims 4, 7, 14, 16, 25.)  Andren is titled "Low Probability of

10  Intercept Communication System," was filed on January 24, 1990, and issued on

11  July 2, 1991, more than one year before the earliest application in the family of the

12  patents-in-suit.  Andren is discussed in detail in the Acampora invalidity report,

13  including Appendix B and throughout the main body of his report, with claim-by-

14  claim and limitation-by-limitation mapping shown in the claim mapping charts for

15  the patents-in-suit.  Dr. Andren's anticipated trial and deposition testimony may

16  further explain the teachings of the Andren reference.  In addition, further context

17  regarding the Andren reference may be provided by reference to the additional

18  documents produced by Andren and with respect to later references in the series of

19  military references based on Andren, such as Swackhammer and Nunez.  The

20  rebuttal report of Odyssey's expert presents arguments that misread Andren.  The

21  report also relies on belated and mistaken claim construction arguments regarding

22  the waveform alphabet, bandwidth, and frequency limitations that conflict with

23  Odyssey's infringement, damages, and priority-date theories.

24      The Swackhammer reference is "Performance Simulation of a Transform

25  Domain Communication System for Multiple Access Applications" by Patrick J.

26  Swackhammer, Michael A. Temple, and Richard A. Raines, IEEE Military

27  Communications Conference Proceedings, 1999 (MILCOM 1999), Volume 2, pp.

28  1055-59.  Swackhammer was published more than one year before the earliest

application in the family of the patents-in-suit.  Swackhammer is discussed in detail in Appendix C of the Acampora invalidity report and throughout the main body of his report, with claim-by-claim and limitation-by-limitation mapping shown in the claim mapping charts for the patents-in-suit.  The rebuttal report of Odyssey's expert presents materially similar arguments for Swackhammer as he presents for Andren, which fail for the same reasons.

The Nunez reference is "Interference Suppression in Multiple Access Communications Using M-ary Phase Shift Keying Generated Via Spectral Encoding," a Master's thesis submitted by Captain Abel Sanchez Nunez, to the Air Force Institute of Technology, all pages (March 2004).  Nunez was published before the earliest application in the family of the patents-in-suit.  Nunez is discussed in detail in Appendix D of the Acampora invalidity report and throughout the main body of his report, with claim-by-claim and limitation-by-limitation mapping shown in the claim mapping charts for the patents-in-suit.  The rebuttal report of Odyssey's expert presents materially similar arguments for Nunez as he presents for Andren, which fail for the same reasons.

The prior art also includes a rich and deep disclosure of "OFDM" (Orthogonal Frequency Division Multiplexing) references, preceding the patents-in-suit by many decades.  The prior art includes articles providing the foundation for OFDM systems by Shannon, Chang, and Weinstein, each of which were published more than three decades before Odyssey's patents.  As digital processing power and techniques for performing Fourier transforms advanced, OFDM-based systems became more prevalent, including high-speed modems in the mid-1980s, DSL systems in the 1990s, and the Wi-Fi and WiMAX wireless standard in the early 2000s.

One example of a wireless OFDM system proposed in the 1990s is the Frodigh reference (U.S. Patent No. 5,726,978), which was filed in 1995.  Frodigh is titled "Adaptive Channel Allocation in a Frequency Division Multiplexed System,"

was filed on June 22, 1995, and issued on March 10, 1998, more than one year before the earliest application in the family of the patents-in-suit. Frodigh is discussed in detail in the Acampora invalidity report, including Appendix E and throughout the main body of his report, with claim-by-claim and limitation-by-limitation mapping shown in the claim mapping charts for the patents-in-suit. Frodigh teaches the same benefits of "dynamic allocation" that Odyssey seeks to take credit for in its expert reports, including providing more bandwidth to users that need higher data rates, providing less bandwidth to users with lower or no data rate needs, and adjusting the allocated frequencies based on measuring channel conditions using a Fourier transform. The rebuttal report of Odyssey's expert presents arguments that misread Frodigh. The report also relies on belated and mistaken claim construction arguments regarding the bandwidth, frequency, and desired spectrum shape limitations that conflict with Odyssey's infringement, damages, and priority-date theories.

The Mitsubori reference (Japanese Pub. No. H11-215095) also dynamically varied frequencies and bandwidths in an OFDM system in response to channel conditions measured using a Fourier transform. Mitsubori is titled "OFDM Signal Transmission Device" and was published on August 6, 1999, more than one year before the earliest application in the family of the patents-in-suit. Mitsubori is discussed in detail in the Acampora invalidity report, including Appendix F and throughout the main body of the report, with claim-by-claim and limitation-by-limitation mapping shown in the claim mapping charts for the patents-in-suit. The rebuttal report of Odyssey's expert presents arguments that misread Mitsubori. The report also relies on belated and mistaken claim construction arguments regarding the bandwidth and waveform alphabet limitations that conflict with Odyssey's infringement, damages, and priority-date theories.

In the mid-1990s, the "ETSI" (European Telecommunications Standards Institute) standards body began working on a third generation (3G) cellular

standard.   (ETSI 1997 at 5-6.)   ETSI formed several "Concept Groups" that developed proposals for the air interface portion of the standard.  (ETSI 1997 at 6.) The collection of proposals was published in December 1997 in TR 101 146 V3.0.0, titled "Universal Mobile Telecommunications System (UMTS); UMTS Terrestrial Radio Access (UTRA); Concept evaluation."  (ETSI 1997 at 1.)  ETSI 1997 was published on the ETSI website and remains available for download to this date.[1]  ETSI 1997 is discussed in detail in the Acampora invalidity report, including Appendix G and throughout the main body of his report, with claim-by-claim and limitation-by-limitation mapping shown in the claim mapping charts for the patents-in-suit.   ETSI 1997 was an example of an OFDM system designed to include the uplink of a cellular system.   The rebuttal report of Odyssey's expert presents arguments that misread ETSI 1997.   The report also relies on belated and mistaken claim construction arguments regarding the bandwidth, frequency, and frequency-content limitations that conflicts with Odyssey's infringement, damages, and priority-date theories.

The prior art also discloses a variety of references that teach using a Fourier transform to "spread" or "pre-code" data in the context of an OFDM system.  One example is the series of references resulting in the Galda reference.  The Galda reference includes Dirk Galda and Hermann Rohling as authors, is titled "A Low Complexity Transmitter Structure for OFDM-FDMA Uplink Systems," and was published in the IEEE Vehicular Technology Conference in Spring 2002.  Galda was published more than one year before the earliest application in the family of the patents-in-suit.   Galda is discussed in detail in Appendix I of the Acampora invalidity report and throughout the main body of his report, with claim-by-claim and limitation-by-limitation mapping shown in the claim mapping charts for the

---

[1]  *E.g.*,   https://portal.etsi.org/webapp/workProgram/Report_Schedule.asp?WKI_ID =6272 (also available via a "Standards" search from the ETSI home page, www.etsi.org).

patents-in-suit.   Galda arose out of a series of publications relating to Fourier transform precoding authored by members of the same research group.   These related publications include the Bruninghaus reference (Karsten Bruninghaus and Hermann Rohling, Multi-Carrier Spread Spectrum and Its Relationship to Single-Carrier Transmission, published by the IEEE in 1998), the Galda presentation (Dirk Galda, Hermann Rohling, Elena Costa, Harald Haas, and Egon Schulz, Broadband OFDM-FDMA system for the Uplink of a Wireless LAN, presented in 2001), and the Costa patent (U.S. Patent No. 7,738,571, Elena Costa, Dirk Galda, Harald Haas, Hermann Rohling, Egon Schulz, Method and Communication System Device for the Generation or Processing of OFDM Symbols in a Transmission System with Spread User Data, published March 27, 2003).   The rebuttal report of Odyssey's expert misreads the Galda reference, both by itself and in the context of the prior art from which it arose.   The report also relies on belated and mistaken claim construction arguments regarding the bandwidth and frequency limitations of the patents-in-suit that conflict with Odyssey's infringement, damages, and priority-date theories.

The Fazel reference is a textbook that provides detailed teachings regarding the use of Fourier transform precoding in OFDM systems.   Fazel is titled "Multi-Carrier and Spread Spectrum Systems" and was published in 2003, more than one year before the earliest application in the family of the patents-in-suit.   Fazel is discussed in detail in Appendix H of the Acampora invalidity report and through the main body of his report, with claim-by-claim and limitation-by-limitation mapping shown in the claim mapping charts for the patents-in-suit.   The rebuttal report of Odyssey's expert presents arguments that misread Fazel.   The report also relies on belated and mistaken claim construction arguments regarding the bandwidth and frequency limitations that conflict with Odyssey's infringement, damages, and priority-date theories.

The prior art further includes a variety of references directly related to the

1  LTE standardization process.  One example is the Motorola reference, which is
2  titled "Uplink Multiple Access for EUTRA," bears the document number R1-
3  050245, and was published by March 30, 2005, as part of the ETSI proceedings that
4  resulted in the LTE standard.   Other LTE proposals related to the Motorola
5  reference include the publication 3GPP R1-050584 (R1-050584) by Motorola
6  entitled "EUTRA Uplink Numerology and Design," submitted on June 15, 2005,
7  and the publication 3GPP R1-050588 (R1-050588) by NTT DoCoMo, Fujitsu,
8  Mitsubishi Electric, and SHARP, submitted on June 16, 2005.   Motorola was
9  published before the earliest application in the family of the patents-in-suit.
10  Motorola is discussed in detail in Appendix J of the Acampora invalidity report and
11  throughout the main body of his report, with claim-by-claim and limitation-by-
12  limitation mapping shown in the claim mapping charts for the patents-in-suit.  The
13  rebuttal report of Odyssey's expert presents arguments that misread the Motorola
14  reference.   The report also relies on belated and mistaken claim construction
15  arguments regarding the bandwidth and frequency limitations that conflict with
16  Odyssey's infringement, damages, and priority-date theories.

17  The Myung reference is titled "Single Carrier FDMA for Uplink Wireless
18  Transmissions" and was published by the IEEE in September 2006.  Myung was
19  published before the March 2008 provisional application in the family of the
20  patents-in-suit.  Because the asserted claims are not entitled to an earlier effective
21  filing date, Dr. Myung's 2006 paper and Dissertation are 102(b) prior art.   Dr.
22  Myung's anticipated trial and deposition testimony may further explain the
23  teachings of the Myung reference.   Dr. Myung's paper also relates to several
24  additional documents authored by Dr. Myung, including his thesis, textbook, and
25  patent.  The Myung reference is discussed in detail in Appendix K of the Acampora
26  invalidity report and throughout the main body of his report, with claim-by-claim
27  and limitation-by-limitation mapping shown in the claim mapping charts for the
28  patents-in-suit.   The rebuttal report of Odyssey's expert does not contest that

Myung invalidates all the asserted claims if it is prior art; the only question is the effective filing date.

The December 2007 LTE references refer to a group of sections from the draft LTE standard, which were published by December 2007.  These references also teach the accused features and were published before the March 2008 provisional application in the family of the patents-in-suit.  The rebuttal report of Odyssey's expert also fails to contest that any limitation is missing from the December 2007 LTE references if they are prior art.

The Acampora invalidity report discusses a number of additional references, which may be used to describe the state of the art and in combinations with the references described above.  For example, the following are some of the many references that teach varying bandwidths and frequencies and may be combined with the references noted above: Bugeja (U.S. Patent App. Pub. No. US2002/017446)), Yellin (U.S. Patent No. 7,660,289), Mattison (U.S. Patent No. 6,246,713), Chow (U.S. Patent No. 5,479,447), and Larrick (U.S. Patent No. 6,026,125).

The references described above, individually and in the combinations recited in the Acampora invalidity report, anticipate the asserted claims and render them obvious.  For example, certain combinations are summarized in paragraph 23 of the Acampora invalidity report, the appendices to the report, and throughout the main body of the report.

### e.   Secondary considerations further confirm the obviousness of the asserted claims.

The evidence of secondary considerations supports a finding of obviousness in this case and, in any event, Odyssey cannot overcome Apple's strong showing of invalidity.  The references discussed above show that the asserted claims were already known in the prior art.  For example, the record does not show any evidence of failed efforts by others to develop the subject matter of the asserted claims or a

long-felt but unmet need, but instead shows repeated, successful disclosures of the same features that Odyssey claims to have invented.   Odyssey points to the commercial success of the accused products, but that commercial success is due to the contributions of Apple and others and has no nexus to Odyssey's asserted claims.   Moreover, no one has praised Dr. Karabinis for anything related to LTE, but instead he has met with repeated failures in obtaining funding related to the subject matter of his patents.

### f.   The asserted claims are not entitled to a pre-filing invention date.

No independent record evidence corroborates either conception or continuous diligence, and Odyssey does not allege an actual reduction to practice before filing. As detailed in the Acampora invalidity report, the notebook entries Odyssey has cited do not provide evidence showing a complete conception of each limitation of the asserted claims.   Moreover, Odyssey has identified no independent, admissible, corroborating evidence of complete conception.   During the summary judgment briefing, Odyssey cited a declaration by Raj Singh and a letter purported sent from Dr. Karabinis to his son.   Neither of these pieces of evidence show the disclosure of a completed thought expressed in such clear terms as to enable those skilled in the art to make the invention.   Moreover, neither piece of evidence is admissible in the trial because neither potentially corroborating witness was identified for trial by Odyssey in its initial disclosures.

Odyssey also has no evidence of diligence.   To the contrary, even if Karabinis' unwitnessed notebook entries mattered (they do not), they account for only 8 days out of the 1,143-day span between the alleged conception in May 2002 and the June 2005 provisional application.   Moreover, neither piece of allegedly corroborating evidence noted above provides corroboration of any diligence or is admissible at trial.

### g. The asserted claims are not entitled to claim priority before March 2008.

The asserted '230, '393, '606, and '940 claims are also not entitled to claim priority before the March 2008 provisional application. Before that date, Odyssey had not disclosed a variety of claimed features, including "providing a frequency content by Fourier transforming a signal" (as in '606 claims 4, 17, 30, 44, and '393 claims 4, 18), or "using a Fourier transform and an inverse Fourier transform" (as in '230 claims 11, 22, 31, 42, 50, 64). For example, the pre-2008 applications did not disclose the use of Fourier transforms and inverse Fourier transforms as claimed in the asserted claims. The 2008 application added an embodiment showing the use of an FFT ('393, '230, and '606 Fig. 17) to provide a frequency content, but the pre-2008 applications did not. Thus, all of the asserted '230, '393, and '606 claims are limited to 2008 filing date, at the earliest.

Likewise, the 2008 application added a discussion of the use of a "control channel" that was not present in any of the earlier applications, which lacked written description support for the full scope of the alleged "dynamic resource allocation" features of all of the claims. (*See, e.g.*, "vary a bandwidth without resorting to chipping" (as in '940 claims 2 and 11).) To the extent that Odyssey relies on new matter added to the '940 patent on February 28, 2013 for specification support, the asserted '940 claims are not entitled to claim priority before February 28, 2013. The 2013 amendments added a new summary, including additional discussion of varying the bandwidth of a waveform sequence, and an allegation that the disclosed invention is relevant to 4G LTE. None of that information can be credited towards the filing date.

### h. The asserted claims are also invalid under 35 U.S.C. § 112.

The asserted claims are also invalid under 35 U.S.C. §112, because the patents-in-suit do not teach the full scope of the asserted claims. The disclosures of the patents-in-suit are focused on covert communications, expressly distinguishing

the alleged invention from conventional systems.  (*E.g.*, '393 col. 1:40-54 (Field of the Invention) ("This invention relates to low interference, high privacy, featureless covert communications systems and/or methods that may also comprise cognitive capability."); '393 col. 19:1-25 (asserting that "[c]onventional communication systems" – such as GSM and CDMA-based systems like CDMA2000 or WCDMA – are undesirable for covert communications, because they use "waveforms that are substantially cyclostationary."); *id.*, col. 18:50-59; '393 col. 19:64-20:15 (asserting that a "sophisticated interceptor" could use a device called a "cyclic periodogram" to detect the presence of cyclostationary communications).)  To achieve covertness, the patents-in-suit describe an alleged invention that uses non-cyclostationary, pseudo-random, and orthonormal waveform alphabets.  The patents-in-suit do not describe a conventional, non-covert system or suggest to a person of skill in the art that Dr. Karabinis possessed an invention directed to conventional, non-covert systems.

In addition, the specifications of the patents-in-suit have no description of the specific features of the conventional, non-covert system Odyssey has accused in this case.  For example, Odyssey has accused the Fourier transform precoding used in LTE of infringing the frequency-content limitations in the asserted claims, but the specifications do not describe any alleged invention in which a Fourier transform is performed on the data to be transmitted.  Thus, all of the claims that broadly recite "using a Fourier transform" or "providing a frequency content by Fourier transforming a signal" or encompass similarly broad claim scope are invalid.  Odyssey has not sought a narrowing construction of such terms and has to the contrary argued that the claims encompass any use of a Fourier transform, no matter how distinctly different that use may be.

Likewise, Odyssey has pointed to the resource element mapper in LTE as infringing the limitations directed to "forming a desired spectrum shape" and "varying the frequencies and bandwidths."  This application of the claims extends

1   beyond any specification support and renders the claims invalid.  The patents-in-

2   suit describe these operations as separate and distinct from any operation performed

3   on data—the spectrum shape is "desired" without reference to any data.   The

4   patents-in-suit do not describe any alleged invention in which the "shape" of the

5   spectrum is "formed" in any respect by the data itself.

### B.   Noninfringement (Civ. L.R. 16.1.f.3.e(3))

7   Evidence regarding noninfringement will be presented from a variety of

8   sources, including exhibits and witness testimony.   Witnesses that may testify

9   regarding noninfringement issues, such as the operation of the accused products and

10   the LTE standard, include the expert witnesses Dr. Anthony Acampora, Dr.

11   Benjamin Goldberg, and on cross-examination, Odyssey's expert Dr. Mung

12   Chiang.  Several fact witnesses may also testify regarding noninfringement issues,

13   including Dr. Hyung Myung, Sachin Sane, and Sami Almalfouh.

14   Apple provides the following short summary regarding noninfringement.  In

15   addition, the disclosures from Apple's expert reports, its discovery responses, its

16   briefing, and the depositions of the witnesses identified above are incorporated by

17   reference.

### 1.   Points of law

#### a.   Literal infringement

20   The patentee must establish infringement by a preponderance of the

21   evidence. *Braun v. Dynamics*, 975 F.2d 815, 819 (Fed. Cir. 1992).  "To establish

22   literal infringement, every limitation set forth in a claim must be found in an

23   accused product, exactly."  *Southwall Tech. v. Cardinal IG*, 54 F.3d 1570, 1575

24   (Fed. Cir. 1995).  Direct infringement of a method claim requires the performance

25   of every step in the claimed method.  *Joy Techs. v. Flakt*, 6 F.3d 770, 775 (Fed. Cir.

26   1993) ("The sale of the apparatus is not a sale of the method.  A method claim is

27   directly infringed only by one practicing the patented method.") (emphasis in

28   original).

### b.   Infringement under the doctrine of equivalents

"The doctrine of equivalents is not a talisman that entitles a patentee to a jury trial on the basis of suspicion; it is a limited remedy available in special circumstances, the evidence for which is the responsibility of the proponent." *Schoell v. Regal Marine*, 247 F.3d 1202, 1210 (Fed. Cir. 2001).   The Federal Circuit requires "particularized testimony and linking argument" to support any equivalents allegation. *Texas Instruments v. Cypress Semiconductor*, 90 F.3d 1558, 1567-68 (Fed. Cir. 1996).   The patentee must present evidence explaining "how" and "why the function and the result were the same." *Texas Instruments*, 90 F.3d at 1568.   Patentees cannot "under the guise of applying the doctrine of equivalents, erase a plethora of meaningful structural and functional limitations of the claim on which the public is entitled to rely." *Gemalto v. HTC*, 754 F.3d 1364, 1373-74 (Fed. Cir. 2014); *Mirror Worlds v. Apple*, 692 F.3d 1351, 1358 (Fed. Cir. 2012) (concluding that "conclusory statements" by expert were insufficient to satisfy the doctrine of equivalents burden); *Bid for Position v. AOL*, 601 F.3d 1311, 1318-19 (Fed. Cir. 2010).

### c.   Inducement of infringement

To establish induced infringement, the patentee first must prove that specific acts of direct infringement by third parties occurred. *Limelight Networks v. Akamai Techs.*, 134 S. Ct. 2111, 2117 (2014).   The patentee must also provide affirmative acts to induce infringement and proof that the accused infringer knew that the accused actions would infringe the patents-in-suit. *Commil USA v. Cisco Sys.*, 135 S. Ct. 1920, 1926 (2015).   The "sale of a lawful product by lawful means, with the knowledge that an unaffiliated, third party may infringe, cannot, in and of itself, constitute inducement of infringement." *Dynacore Holdings v. U.S. Philips*, 363 F.3d 1263, 1276 n.6 (2004) (citations omitted).   Nor will instructions from an alleged infringer alone support a finding of inducement absent an affirmative intent to promote infringement, as "describing" is not the same as "encouraging" or

"promoting" an allegedly infringing use. *Takeda Pharm. U.S.A. v. West-Ward Pharm.*, 785 F.3d 625, 630-31 (Fed. Cir. 2015) (internal citations omitted).

### 2.      Material facts

#### a.      The accused Apple products.

Odyssey has accused the following Apple iPhones and iPads:

| iPhones | iPads |
|---------|-------|
| iPhone 5 | iPad 3 |
| iPhone 5s | iPad 4 |
| iPhone 5c | iPad Air |
| iPhone 6 | iPad Air 2 |
| iPhone 6 Plus | iPad Mini |
| iPhone 6s | iPad Mini 2 |
| iPhone 6s Plus | iPad Mini 3 |
| iPhone SE | iPad Mini 4 |
| | iPad Pro |

#### b.      The accused Apple products do not literally infringe.

As described in Apple's briefing, discovery responses, and expert reports, the accused Apple products do not infringe the asserted claims. Apple provides the following short summary regarding some of the reasons why the accused Apple products do not infringe.

The Court has construed nearly all of the asserted claims as requiring the use of a "waveform alphabet." (*E.g.*, '393 claims 4, 18; '837 claims 1, 6, 11, 14, 21, 27; '940 claims 2, 11; '230 claims 11, 22, 31, 42, 50, 64; '606 claims 4, 30.) The accused Apple products do not use a waveform alphabet. Instead, the LTE uplink uses a fundamentally different method for generating the waveforms to be transmitted wirelessly over the air. Numerous steps preclude the correspondence between data and waveforms required by a waveform alphabet and the Court's constructions. Fourier transform precoding precludes any correspondence between the symbols output from the modulation mapper and the waveforms ultimately

transmitted from the device.  Resource element mapping, including the allocation of frequencies from the base station, further precludes any correspondence between the data and the transmitted waveforms.  Unlike a waveform alphabet in which the amplitudes and frequencies of the waveform are chosen by the data, the LTE uplink does not use the data to select the frequencies used for transmission.  Instead, the frequencies are selected by the base station, independent of the data, and provided to the end-user device.  In the LTE uplink, the data corresponds to only amplitude and phase, not to frequency.  In addition, the accused Apple products do not choose or assign an information symbol to a waveform using a waveform alphabet, as required by the Court's constructions.

Each asserted claim from the '393 and '606 patents recites a limitation directed to "providing a frequency content for a waveform by Fourier transforming a signal."  (*E.g.*, '393 claims 4, 18; '606 claims 4, 17, 30, 44.)  The Court has construed these related terms as, *e.g.*, "providing a frequency content by subjecting a desired band of frequencies to a Fourier transform."  (Dkt. 169 at 17, 24-25.)  The accused Apple products do not perform this step.  Fourier transform precoding does not take a time-domain signal and produce frequency content.  Instead, precoding simply takes data as an input and provides data as an output.  In addition, the precoding step in LTE does not perform a Fourier transform on a desired band of frequencies, because the data has not yet been routed to any frequencies at the accused stage of the LTE uplink.

Several claims in the '837, '230, and '606 patents recite a limitation directed to "selecting a frequency interval over which the waveform is to exist."  ('837 claims 21, 27; '230 claims 50, 64; '606 claims 17, 44.)  In LTE, a device called the eNodeB selects which frequency intervals will be used for transmission and sends signals to the end-user devices dictating which frequency intervals will be used.  As a result, the end-user device cannot select the frequency interval over which the waveform is to exist.

All asserted claims from the '393, '837, '230, and '606 patents require the use of a "single carrier" for transmission.  (*E.g.*, '393 claims 4, 18; '837 claims 1, 6, 11, 14, 21, 27; '230 claims 11, 22, 31, 42, 50, 64; '606 claims 4, 17, 30, 44.)  But the LTE uplink employs a multi-carrier air interface in which each symbol outputted from the Fourier transform precoder is resource mapped onto a different subcarrier.

Each asserted claim also recites a limitation requiring that the bandwidth or frequencies be varied.  (*E.g.*, '393 claims 4, 18; '837 claims 1, 6, 11, 14, 21, 27; '940 claims 2, 11; '230 claims 11, 22, 31, 42, 50, 64; '606 claims 4, 17, 30, 44.)  The prior art taught varying frequencies and bandwidth, which was a well-known, obvious way of attempting to optimize system performance.  In his rebuttal report, Odyssey's technical expert, Dr. Chiang, argued that the claims require the further unclaimed limitation of varying the bandwidth or frequencies within a "burst," which he argued that the references failed to teach.  The accused Apple products likewise do not vary the bandwidth or frequencies within a burst, as the subcarriers are held constant throughout an entire transmission time interval ("TTI").  Odyssey argues that the carriers have the ability to change subcarrier allocations from one TTI to the next, but cites no evidence that any carrier has done so in a way that would implicate the claims.

### c.   Odyssey did not preserve a doctrine-of-equivalents theory.

As detailed in Apple's motion for summary judgment, Odyssey did not preserve any theory under the doctrine of equivalents.  (Mem., Dkt. 263 at 11-12; Reply, Dkt. 303 at 5; Response, Dkt. 316.)  In its summary judgment order, the Court declined to reach the issue of equivalents, because it denied the motion for summary judgment on literal infringement.  (Order, Dkt. 322 at 22 n.7.)  In addition, the LTE uplink uses processing that is fundamentally different from, and not equivalent to, a waveform alphabet.

#### d.    Apple has not induced infringement.

Odyssey has not provided any evidence that could support a claim of induced infringement.  For example, as described above, inducement requires a showing that Apple knew that the accused acts would constitute infringement.  But Odyssey has cited no evidence that Apple has ever held any such belief.  (*E.g.*, Chiang Apple Rpt., ¶ 67 (Dkt. 263, Ex. 9) (providing no citations to record evidence of specific knowledge of infringement and affirmative acts to encourage infringement).)  In addition, Odyssey has not identified any specific acts of direct infringement, nor has it alleged that Apple has contributorily infringed.

#### e.    Odyssey did not allege willful infringement.

Because Odyssey did not plead willful infringement, willfulness is not at issue in this trial.

### III.   ADDITIONAL DISCLOSURES OF MATERIAL FACTS AND LAW (CIV. L.R. 16.1.F.2).

#### A.    General Disclosures (Civ. L.R. 16.1.f.2.a)

##### 1.    Damages

Odyssey is not entitled to any damages.  In addition, Apple intends to introduce evidence from a variety of sources, including exhibits and witness testimony, relating to Odyssey's damages demands and an appropriate reasonable royalty, if liability were to be found.  Witnesses that may testify regarding damages issues—including technical issues relating to the prior art and the accused products and economic and survey-related issues—include the expert witnesses Dr. Anthony Acampora, Dr. Dominique Hanssens, and Dr. Matthew Lynde and, on cross-examination, Dr. Mung Chiang, Dr. Scott Savage, and Roy Weinstein.  Several fact witnesses may also testify regarding technical and non-technical damages issues, including Dr. Carl Andren, Frank Casanova, Heather Mewes, Dr. Hyung Myung, Sachin Sane, Sami Almalfouh, Michael Jaynes, Surpiya Gujral, and Dr. Robert Love.  In addition, Apple reserves the right to rely on any further testimony arising

from the further deposition of Dr. Karabinis ordered by the Court, and a supplemental rebuttal report responding to the second supplemental report of Mr. Weinstein, if the supplemental report is permitted.

Apple provides the following short summary regarding damages issues.  In addition, the disclosures from Apple's expert reports, its discovery responses, and the depositions of the witnesses identified above are incorporated by reference.

### a.   Points of law

In patent-infringement cases, economic damages are determined pursuant to 35 U.S.C. § 284.  A patent holder is not entitled to damages that are remote or speculative.  *Wordtech Sys. v. Integrated Networks Sols.*, 609 F.3d 1308, 1318-22 (Fed. Cir. 2010) (finding damages award based only on speculation or guesswork); *LaserDynamics v. Quanta Computer*, 694 F.3d 51, 69 (Fed. Cir. 2012); *Lucent Techs. v. Gateway*, 580 F.3d 1301, 1340 (Fed. Cir. 2009) (vacating and remanding jury award as excessive).  "The patentee bears the burden of proving damages," and the patentee must sufficiently tie the expert testimony to the facts of the case. *Uniloc USA v. Microsoft*, 632 F.3d 1292, 1315 (Fed. Cir. 2011); *Power Integrations v. Fairchild*, 711 F.3d 1348, 1374 (Fed. Cir. 2013) (excluding expert opinion "based on insufficient data").

The Federal Circuit has "held many times [that] using sufficiently comparable licenses is a generally reliable method of estimating the value of a patent."  *Apple v. Motorola*, 757 F.3d 1286, 1325 (Fed. Cir. 2014) (noting that "[t]he second *Georgia-Pacific* factor is '[t]he rates paid by the licensee for the use of other patents comparable to the patent in suit'"), *overruled on other grounds by Williamson v. Citrix Online*, 792 F.3d 1339 (Fed. Cir. 2015); *Ericsson v. D-Link Sys.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014) ("This court has recognized that licenses may be presented to the jury to help the jury decide an appropriate royalty award."); *VirnetX v. Cisco Sys.*, 767 F.3d 1308, 1330-31 (Fed. Cir. 2014).

Nevertheless, "[m]any considerations other than the value of the

1   improvements patented may induce the payment" of settlement agreements, chief

2   among them the "avoidance of the risk and expense of litigation." *Rude v. Westcott*,

3   130 U.S. 152, 164 (1889) (cited in *LaserDynamics*, 694 F.3d at 77-78)).

4       Proof of damages must be tied to "the claimed invention's footprint in the

5   market place." *ResQNet.com v. Lansa*, 594 F.3d 860, 869 (Fed. Cir. 2010). "When

6   the accused infringing products have both patented and unpatented features,

7   measuring this value requires a determination of the value added by such features

8   …. The essential requirement is that the ultimate reasonable royalty award must be

9   based on the incremental value that the patented invention adds to the end product."

10  *Ericsson*, 773 F.3d at 1226. "[A]ll expert damages opinions must separate the

11  value of the allegedly infringing features from the value of all other features."

12  *Commonwealth Sci. & Indus. Research Organisation v. Cisco Sys.*, 809 F.3d 1295,

13  1301 (Fed. Cir. 2015), *cert. denied*, 2016 WL 3032735 (2016). "When a patent is

14  for an improvement, and not for an entirely new machine or contrivance, the

15  patentee must show in what particulars his improvement has added to the

16  usefulness of the machine or contrivance. He must separate its results distinctly

17  from those of the other parts, so that the benefits derived from it may be distinctly

18  seen and appreciated." *Garretson v. Clark*, 111 U.S. 120, 121 (1884).

19      In addition, under Ninth Circuit law, a party proposing to use a survey must

20  lay a "proper foundation for admissibility," including establishing that the survey

21  was both "relevant" and "conducted according to accepted principles." *Clicks

22  Billiards v. Sixshooters*, 251 F.3d 1252, 1263 (9th Cir. 2001); *Oracle Am. v.

23  Google*, No. 10-3561, 2012 WL 850705, at *10 (N.D. Cal. Mar. 13, 2012);

24  *NetAirus Techs. v. Apple*, No. 10-3257 (C.D. Cal. Oct. 23, 2013)

### b.   Material facts

> **(1)   Odyssey has not shown that its alleged inventions provide any value to Apple or its customers over the prior art.**

28  To take this case out of the range of typical patent valuations (which are in

the thousands, not hundreds of millions, of dollars), Odyssey needed to present evidence that its patents made a dramatic difference to Apple and its customers. That task required a sound technical foundation backed by reliable simulations, tests, and economic analysis, not mere conjecture—as it is undisputed that many non-patented factors contribute to LTE's enhanced speeds.

Odyssey and its team of experts and attorneys had many years to conduct reliable simulations or tests that would show the impact (if any) the alleged inventions had on Apple's accused products and its customers. Odyssey's experts were aware of reliable scientific and economic techniques that might help quantify the impact of the alleged inventions.   But those techniques would have shown that the alleged invention had only a de minimis impact on Apple and Apple customers, and Odyssey did not ask any of its experts to perform them.   Instead, Odyssey offered only the unreliable and mistaken damages approaches addressed in Apple's *Daubert* briefing and its expert reports.   Moreover, as discussed above, Odyssey's damages theories conflict with its validity arguments.

Apple also intends to introduce evidence at trial from a variety of sources, including exhibits and witness testimony, showing that Odyssey's alleged invention does not provide any perceptible value to Apple or its customers.

### (2)   Comparable agreements

As described in more detail in, for example, Apple's expert reports and its briefing, several license agreements Apple has entered into are comparable agreements that provide a baseline for the jury to consider were it to award any damages.   In contrast, the Motorola settlement agreement is not comparable to the hypothetical negotiation in this case and should be excluded for the reasons provided in Apple's currently pending motions in limine.

### (3)   Smallest-salable-unit   analysis   and   royalty stacking

As described in more detail in, for example, Apple's expert reports and its

briefing, Odyssey also does not properly account for the smallest salable unit. Consistent with Apple's licensing practices, any appropriate measure of damages must consider the smallest salable unit allegedly practicing the asserted claims. Here, the smallest salable unit is the baseband processor, not smartphones or tablets as a whole.  In addition, any appropriate measure of damages must also account for royalty stacking from the many patents and other technologies incorporated into a product like a baseband processor.

> **(4)   Odyssey's experts seek to present unreliable opinions that do not provide any basis for evaluating damages.**

As described in more detail in, for example, Apple's *Daubert* briefing and the expert reports of Apple's experts Dr. Acampora, Dr. Lynde and Dr. Hanssens, Odyssey's experts seek to offer damages opinions that lack a proper foundation in scientific methodology, the facts of this case, and are flawed in numerous respects.

## 2.   Standing

Apple has previously briefed the issue of standing and incorporates that briefing by reference.  (Dkt. 189, 206.)  The Court denied Apple's motion "based on a review of the evidence in the record."  (Dkt. 216 at 15.)  At trial, Apple may introduce further evidence regarding Odyssey's lack of standing, including exhibits and witness testimony, such as testimony on cross-examination from Dr. Karabinis.

### a.   Points of law

Odyssey lacks standing due to an agreement that automatically assigned away any rights he might have had to the patents-in-suit.  Standing may be raised at any stage of the case. *Pandrol USA v. Airboss Ry. Prods.*, 320 F.3d 1354, 1367 (Fed. Cir. 2003); *MHL Tek v. Nissan Motor*, 655 F.3d 1266, 1273-74 (Fed. Cir. 2011); *DDB Techs. v. MLB Advanced Media*, 517 F.3d 1284, 1291-92 (Fed. Cir. 2008).  The particular agreement language at-issue in this case arises from a long line of decisions recognizing that contracts using "hereby grants" language automatically assign rights to future inventions as soon as they are created. *E.g.*,

*FilmTec. v. Allied-Signal*, 939 F.2d 1568, 1570, 1573 (Fed. Cir. 1991); *Speedplay v. Bebop*, 211 F.3d 1245, 1253 (Fed. Cir. 2000); *Imation v. Koninklijke Philips Elecs.*, 586 F.3d 980, 986 (Fed. Cir. 2009); *DDB Techs.*, 517 F.3d at 1290.

### b.    Material facts

Odyssey lacks standing to assert the patents-in-suit.  During the course of his employment from 2001 to 2010 with Mobile Satellite Ventures ("MSV"), Dr. Karabinis served as the Chief Technical Officer, writing patents for MSV.  When he started work at MSV, he entered into employment agreements that automatically assigned away all patent rights to his employer.  Because the MSV Agreements automatically assigned Karabinis' entire rights to his work to MSV, Karabinis could not assign those patent applications to his own company.

## B.    Abandoned Issues (Civ. L.R. 16.1.f.2.b)

Odyssey has abandoned a variety of claims, including all allegations that Apple infringes U.S. Patent No. 8,660,169 and that Apple infringes any of the claims of the remaining patents-in-suit other than the currently asserted claims.

Apple is not aware of any issues that it has abandoned and expressly reserves the right to challenge on appeal all of the adverse rulings to date.

## C.    Exhibit List (Civ. L.R. 16.1.f.2.c)

Attached as Exhibit A is a list of exhibits Apple expects to offer at the trial other than those to be used for impeachment with a description of each exhibit sufficient for identification.  Apple reserves the right to include alternative copies of the same documents, including physical copies (e.g., textbooks), native versions, and electronically searchable versions.  Apple further reserves the right to offer at trial exhibits identified on Odyssey's exhibit list.   Apple also notes that the inclusion of an exhibit on its list of exhibits is not agreement or consent that the exhibit may be admitted if presented by Odyssey, or a representation that Apple agrees that the exhibit should be introduced as evidence.  For example, Odyssey's expert reports are not admissible, and are listed here solely for identification as

1    items that may be used during the cross-examination of Odyssey's experts and

2    other witnesses.  In addition, the exhibit list may include exhibits subject to Apple's

3    motions in limine.

4        **D.    Witnesses (Civ. L.R. 16.1.f.2.d)**

5        Attached as Exhibit B is a list of witnesses, including the names and

6    addresses of all prospective witnesses, except impeaching witnesses, and, in the

7    case of expert witnesses, a brief narrative statement of qualifications of such

8    witness and the substance of the testimony which such witness is expected to give.

9    Exhibit B further indicates the current may call / will call status of the witnesses.

10       In addition, Apple will provide its deposition designations by October 13,

11   2016, in compliance with the Court's Scheduling Order (Dkt. 111, ¶ 30).

12

13

14   Dated:   October 5, 2016          */s/ Timothy S. Teter*
                                        TIMOTHY S. TETER (171451)
15                                      (teterts@cooley.com)
                                        MATTHEW J. BRIGHAM (191428)
16                                      (mbrigham@cooley.com)
                                        BENJAMIN G. DAMSTEDT (230311)
17                                      (bdamstedt@cooley.com)
                                        LOWELL D. MEAD (223989)
18                                      (lmead@cooley.com)
                                        PRIYA VISWANATH (238089)
19                                      (pviswanath@cooley.com)
                                        DENA CHEN (286452)
20                                      (dchen@cooley.com)
                                        COOLEY LLP
21                                      3175 Hanover Street
                                        Palo Alto, CA 94304
22                                      Tel:  650-843-5000
                                        Fax:  650-849-7400
23
                                        Attorneys for Defendant
24                                      Apple Inc.

25

26

27

28

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned certifies that counsel of record who are deemed to have consented to electronic service are being served on October 5, 2016, with a copy of this document via the Court's CM/ECF system per Local Rules.  Any other counsel will be served by electronic means, facsimile, overnight delivery and/or first class mail on this date.

By: */s/ Timothy S. Teter*

137011889